BENDIX HOME SYSTEMS,
INC., Appellant,

v.

John M. JESSOP and Linda L.
Jessop, Appellees,

John M. JESSOP and Linda L. Jessop,
Cross-Appellants,

v.

ALASKA NATIONAL BANK OF THE
NORTH, Cross-Appellee.

Nos. 6087, 6110.

Supreme Court of Alaska.

May 14, 1982.

Robert B. Groseclose, Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, for appellant.

Arthur L. Robson, Fairbanks, for appellees, cross-appellants.

Charles R. Pengilly, Law Offices of Charles E. Cole, Fairbanks, for cross-appellee.

Before BURKE, C. J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

OPINION

RABINOWITZ, Justice.

This appeal presents the question of the proper method of measuring damages for a manufacturer's breach of the implied warranty of merchantability. We hold that the superior court erred in its calculation of damages and that the evidence does not support the superior court's award of $55,815. Accordingly, we remand this case to the superior court for a redetermination of damages.

In May 1976, John and Linda Jessop purchased a new mobile home from a Fairbanks dealer, Columbia Mobile Homes [Columbia]. The Jessops gave Columbia a downpayment of $3,500 and executed a conditional sales contract for the remainder of the purchase price of $45,685. The conditional sales contract was assigned by Co-

lumbia to Alaska National Bank of the North [the Bank].

From the outset the mobile home proved to be a homeowner's nightmare. Shortly after the home was delivered the Jessops noticed that it suffered from minor defects such as a scratched bathtub, torn linoleum, and broken windows. These defects, which apparently were remedied by Columbia, proved miniscule in comparison to the problems which arose when winter arrived. In short, the mobile home had a disturbing habit of "raining inside" which was caused by a leaky roof[1] and by condensation of moisture in the attic.[2] Water ran out of electrical outlets, vents, cupboards, and light fixtures. Windows and doors filled with water and burst when the water froze. The water damaged furnishings and generally made life miserable for the Jessops and their four young children. Both Columbia and the manufacturer of the home, Bendix Home Systems, Inc. [Bendix], made repeated efforts to cure the raining problem;[3] nothing worked.

1. Several witnesses testified that the roof was too flat and that the inadequate slope caused water to accumulate on the roof during periods of heavy rain and to seep under the shingles and through nail holes. In addition, during warm spells, accumulated ice and snow would melt and cause further leaking.

2. Apparently moisture-laden warm air from inside the home would escape into the attic; the moisture would then condense and leak back into the home.

3. Columbia or Bendix repaired the roof, refurbished the interior of the home, installed vents in the attic, and made other repairs over a period of several years.

4. The Jessops also named two Columbia employees as defendants but later abandoned their claims against those defendants.

5. See AS 45.02.314(a), which provides in part that

[u]nless excluded or modified (AS 45.02.316), a warrant that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

In Morrow v. New Moon Homes, Inc., 548 P.2d 279, 289 (Alaska 1976), we held that the manufacturer as well as the seller of a defective item may be held liable for breach of the implied warranty of merchantability even though

Eventually the Jessops filed suit against Columbia, Bendix, and the Bank,[4] seeking either rescission or damages. The Bank in turn filed a counterclaim to recover the amount due on the conditional sales contract. Prior to trial the Jessops settled their claims against Columbia, which was in bankruptcy, for $1,000.

After a bench trial the superior court awarded the Jessops damages of $55,815 against Bendix for its breach of the implied warranty of merchantability[5] and awarded the Bank damages of the same amount against the Jessops.[6] The net effect of the superior court's judgment was to require Bendix to pay damages equal to the balance due the Bank on the conditional sales contract.

On appeal, Bendix concedes that it is liable to the Jessops, but argues that the superior court calculated damages erroneously and that the evidence does not support an award of $55,815.[7]

the purchaser did not acquire the item directly from the manufacturer.

6. We note that the amount awarded the Bank, $55,815, substantially exceeds the original amount financed by the Bank, $44,742. No party has explained the composition of the sum awarded the Bank—e.g., principal, accrued interest, late payment charges—but the Jessops do not argue that the Bank's figure is incorrect.

7. The Jessops assert on appeal that any reduction in the amount that they receive from Bendix must be accompanied by an equal reduction in the amount that they are required to pay the Bank. The Jessops have cited no authority for this proposition and we have found none. We perceive no relationship between the two damage awards which requires a reduction in the amount payable to the Bank if there is a reduction in the amount that the Jessops receive from Bendix. The Jessops' claim against Bendix is for inadequate product value; they are entitled to compensation for loss of value but not necessarily for the full amount owed to the Bank.

We note, however, that the Jessops could have pursued several claims against the Bank which might have reduced, or perhaps eliminated, their obligation to the Bank. First, a clause in the conditional sales contract provides that the Bank is subject to all claims and defenses that the Jessops could have asserted against

## Uniform Commercial Code Remedies for Breach of the Implied Warranty of Merchantability

Article 2 of the Uniform Commercial Code, which has been adopted in Alaska,[8] sets forth the remedies available to persons who have purchased "nonconforming" goods.[9] Among those remedies is the right to recover damages measured by the difference between "the value of the goods accepted and the value they would have had if they had been as warranted," at the time and place of acceptance. AS 45.02.714(b). In addition a buyer may recover incidental and consequential damages. AS 45.02.-714(c), .715.

AS 45.02.608 provides a second remedy, revocation of acceptance. The superior court ruled in this case that the Jessops were not entitled to revoke their acceptance of the mobile home; since that ruling has not been appealed,[10] we need consider only Bendix's arguments pertaining to the dam-ages remedy fashioned by the superior court pursuant to AS 45.02.714(b).

## Bendix's Allegations of Error

The superior court ostensibly used the damage remedy provided by AS 45.02.714(b) —the difference between the value as warranted of the mobile home and its actual value—and concluded that this difference equalled $55,815. To reach this conclusion the superior court determined that the value as warranted of the home was its credit price—*i.e.*, the cash price plus finance charges. The court then reasoned that the home had some actual value notwithstanding the raining problem, since the Jessops and their four children had lived in it continuously for four and one-half years, and ruled that the actual value of the home was the amount that the Jessops had paid toward the purchase price. Having ascertained the difference between the value as warranted and the actual value of the

the seller, Columbia. Second, even absent such a contractual provision state law provides that an assignee of consumer paper is subject to the claims and defenses that the buyer could assert against the seller. *See* AS 45.50.541(b). The Jessops did not raise these issues at trial or on appeal. Finally, a legend stamped upon the contract provides:

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL BE LIMITED TO AMOUNTS PAID BY THE DEBTOR HEREUNDER.

This legend apparently was placed on the contract in compliance with federal law, *see* 16 C.F.R. § 433.2 (1981) (Federal Trade Commission rule), although the F.T.C. rule requiring such a legend on consumer paper did not become effective until after the Jessops had purchased their mobile home. Even if not required by federal law at the time of the Jessops' purchase, the legend was part of the agreement between the Jessops and Columbia and hence was binding upon Columbia's assignee, the Bank.

The Jessops brought this stamped legend to the attention of the superior court, but the superior court ruled that the legend did not affect the Bank's right to recover the balance due on the conditional sales contract. On appeal the Jessops have not raised or briefed the question of the effect of this legend upon the Bank's liability, and thus we deem the issue to be abandoned. *See, e.g., Wetzler v. Wetzler,* 570 P.2d 741, 742 n.2 (Alaska 1977) (per curiam). Further, the Bank points out that any claim against it arising under the contract was extinguished when the Jessops settled their claims against the seller, Columbia. Since the effect of the Bank's liability as an assignee of the contract has not been preserved on appeal, we need not and do not address the question whether the Jessops' settlement with Columbia released the Bank from liability.

**8.** *See* AS 45.02.101–.725.

**9.** In *Morrow v. New Moon Homes, Inc.,* 548 P.2d at 286–87, we held that mobile homes are "goods" covered by Article 2 of the Uniform Commercial Code.

Goods may be "nonconforming" for a variety of reasons; in this case the nonconformity is that the home does not meet the implied warranty of merchantability.

**10.** Although the Jessops suggested at oral argument that this court should consider whether the superior court erred in ruling that they could not revoke their acceptance, the Jessops did not appeal or brief this aspect of the superior court's judgment and thus we will not entertain their argument on appeal. *See, e.g., Wetzler v. Wetzler,* 570 P.2d 741, 742 n.2 (Alaska 1977) (per curiam).

mobile home, the court then subtracted the $1,000 settlement paid by Columbia from that difference, for a net damage award against Bendix of $55,815.[11] The court further ruled that Bendix was entitled to retrieve the mobile home if it so desired.

Bendix's first argument on appeal is that the superior court's remedy is the functional equivalent of the remedy that would have been applied had the Jessops revoked their acceptance (hereinafter "rescission"[12]) and that it is thus erroneous because the court ruled that the rescission remedy was not available, a ruling that has not been appealed. Bendix asserts that when a court refunds the bulk of the purchase price of a defective item to the buyer and allows the seller or manufacturer to take the item back, the remedy used is rescission no matter what label is applied. Our resolution of the damage issue, however, has made any discussion of this first point unnecessary.[13]

Bendix's second argument on appeal is that the superior court erred in adding finance charges to the selling price of the mobile home to arrive at the value as warranted of the home. We hold that finance charges should not have been included in the home's value as warranted.[14]

Although some buyers prefer to, or must, spread the purchase price of an item over a period of years and thus incur finance charges, those charges do not increase the value of the item purchased. We reach this conclusion for two reasons. First, when a buyer elects to, or must, defer payment of the purchase price of an item, in effect he purchases two items: the goods themselves, and the right not to pay for the goods immediately. Second, even if we were to assume that finance charges are part of the value of an item, those charges should be included only at their discounted present value. In this case if the Jessops' payments on the home are discounted to present val-

---

**11.** We are unable, on the record before us, to reconstruct the superior court's calculation; however, since the parties agree that the superior court calculated the Jessops' damages in the manner just described, we will assume that the parties are correct.

We also take this opportunity to clarify certain dictum in *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976). When calculating the Jessops' damages the superior court relied upon a passage from *Morrow* which provides:

> "Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be 'out of pocket'—the difference in value between what is given and received—or 'loss of bargain'—the difference between the value of what is received and its value as represented."

*Id.* at 290, *quoting* Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L. Rev. 917, 918 (1966). The superior court correctly observed that the Jessops' claim was for direct economic loss, but, relying on the above passage from *Morrow*, went on to consider whether the Jessops' direct economic loss should be their "out of pocket" loss or their "loss of bargain." The court then selected "out of pocket" loss as the measure of the Jessops' direct economic loss. "Out of pocket" loss—the difference between the actual value of an item and its purchase price—is not, however, the measure of damages prescribed by AS 45.-02.714(b). That provision requires a "loss of bargain" measure of damages—the difference

between the actual value of an item and its value as warranted, rather than its purchase price. *See generally* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 10–2 (2d ed. 1980). Our discussion in *Morrow* of the various theories of damages for breach of warranty was not intended to suggest that an "out of pocket" measure of damages could be substituted for the formula prescribed by AS 45.02.714(b).

**12.** Although there is a distinction between the Uniform Commercial Code's remedy of revocation of acceptance and the common law remedy of rescission, *see* J. White & R. Summers, *supra* note 11, § 8–1, at 295, we here use the term rescission in the interest of economy.

**13.** *See Puritan Mfg., Inc. v. I. Klayman & Co.*, 379 F.Supp. 1306, 1314 (E.D.Pa.1974).

**14.** We recognize that several courts which have considered this question have concluded that finance charges may be included when calculating the value as warranted of a defective item. *See, e.g., Thompson Chrysler-Plymouth, Inc. v. Myers*, 48 Ala.App. 350, 264 So.2d 893, 896–97 (1972); *Burrus v. Itek Corp.*, 46 Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.E.2d 1168, 1172 (1977). *But see Long v. Quality Mobile Home Brokers, Inc.*, 271 S.C. 482, 248 S.E.2d 311, 313 (1978). We conclude that the better rule is that the value of an item is not increased by finance charges.

ue, that value is equal to the cash purchase price of the home.

Bendix's final argument on appeal is that the record does not support a damage award of $55,815. At trial the Jessops offered no evidence of the value as warranted of the mobile home except the fact that they paid $45,685 for it. Absent evidence that the value as warranted differs from the purchase price, however, the purchase price is persuasive evidence of the value as warranted of the mobile home.

The problematic aspect of the damages analysis is the second prong of the formula prescribed by AS 45.02.714(b), namely, determining the actual value of the defective home. The Jessops offered no evidence of the actual value of the home; the only evidence in the record going to this question are estimates of the cost of remedying the defects and refurbishing the home. Absent evidence, such as an appraisal, of the actual value of the home, the only basis for awarding damages is the cost of repairing the home so that it will conform to the warranties of sale.[15]

The highest of the estimates of repair costs is $20,000–$25,000, a "guess" by an acquaintance of the Jessops who conceded that he was not sufficiently familiar with the home to know what repairs were necessary.[16] This "guess", which is well below the $55,815 awarded the Jessops by the superior court, is the largest possible amount of damages for which there is evidence in the record.[17]

The case is remanded in part[18] to the superior court with directions to recompute the Jessops' damages in a manner consistent with this opinion. The superior court may, in its discretion, reopen the record and consider additional evidence of damages, if any.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

---

15. See, e.g., Morrow v. New Moon Homes, Inc., 548 P.2d at 290 n.34 (" 'frequently the measure [of damages] is determined by reference to the cost of repairs' "), quoting with approval J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 10–1 (1972). See also Jones v. Abriani, 169 Ind.App. 556, 350 N.E.2d 635, 646 (1976) (one method of measuring damages for defective mobile home is to use the cost of repairs); cf. Foremost Mobile Homes Mfg. Corp. v. Steele, 506 S.W.2d 646 (Tex.Civ.App.1974) (dictum) (repair cost a proper measure of damages but plaintiffs failed to adduce acceptable evidence of cost of repairing defective mobile home).

16. A Bank employee whose job was to refurbish repossessed mobile homes testified after inspecting the home that it would cost $8,000–$10,000 to put the mobile home in as close to factory condition as possible; forty percent of the necessary expenditures would be attributable to the Jessops' wear and tear on the home. This estimate did not include the cost of reconstructing the roof, if necessary; the only evidence of the cost of repairs to the roof is one witness's statement that the roof could be hottarred for $5,000.

17. In light of our disposition of this appeal we need not consider Bendix's argument that the more credible testimony established a much lower repair cost, or whether the $20,000–$25,000 guess constitutes evidence which would justify an award in the $20,000–$25,000 range.

18. For the reasons set forth in note 7 supra we affirm the portion of the superior court's judgment awarding the Bank $55,815 against the Jessops.