(647 P.2d 820)
No. 52,959

SCHATZ DISTRIBUTING CO., INC., *Appellee,* v. OLIVETTI CORPORA-TION OF AMERICA, *Appellant,* v. EXECUTIVE FINANCIAL SERVICES, INC., *Appellee.*

Opinion filed July 2, 1982.

*Eileen Hiney* of McDowell, Rice & Smith, Chartered, of Kansas City, for the appellant.

*W. Fredrick Zimmerman* of Thompson & Verbanic, of Kansas City, for the appellee Schatz Distributing Co., Inc.

Before SPENCER, P.J., PARKS, J., and RONALD D. INNES, District Judge Assigned.

SPENCER, J.: Defendant Olivetti Corporation of America, a manufacturer and distributor of business machines, has appealed from judgment in favor of plaintiff for damages resulting from

breach of warranty in the sale to plaintiff of an Olivetti DE-525 computer with related equipment.

Anticipating a substantial increase in its accounts, plaintiff, through its then president Michael Scherzer, commenced negotiations with defendant for the purchase of a computer. A meeting was arranged with Jim Neese, an Olivetti sales representative, at which Robert Wedow, plaintiff's accountant, explained to Neese the contents of a three-page list of functions which plaintiff expected to accomplish by means of a computer, with particular emphasis on general ledger accounting, inventory analysis, route profitability, and container analysis. Neese advised that defendant's DE-525 computer would satisfactorily perform all the functions outlined, and further that plaintiff would "never outgrow" the system. These assurances were also recorded in two items of correspondence directed to Scherzer by Neese during the latter part of 1975.

The sale was accomplished in January and February, 1976, but since plaintiff did not desire to pay the full price at the time of purchase, defendant arranged for a lease purchase agreement with Executive Financial Services, Inc. Defendant then sold the computer directly to that company, which contracted with plaintiff for the purchase of the computer by means of monthly payments. Plaintiff had previously paid defendant $1,000.

The computer remained unused and in August, 1976, Thomas Creach, plaintiff's office manager, scheduled a meeting with Neese, Neese's superior Charles Wildman, and an Olivetti programmer. The purpose of that meeting was to discuss what steps needed to be taken to get the computer into operation. Creach was advised that Olivetti did not have the personnel available to install the software desired, but that Neese would nevertheless seek a competent programming firm on plaintiff's behalf.

In March of 1977, Neese arranged a meeting between Creach and representatives of Information Services International, Jim Burke and Raymond Lear. As a result of this meeting, plaintiff entered into an agreement with Information whereby the latter contracted to program the computer with a "general ledger processing" system for $3,000. Plaintiff made a down payment of $1,500.

To assist Burke in programming the computer, Neese provided several operations manuals for setting up a general ledger system

for the DE-525 computer. In order to familiarize himself with the computer and the programs provided, Burke spent several hours working on the DE-525 computer at Olivetti's Kansas City, Missouri, facility. Despite this, Burke was unable to get the computer to function. In an effort to gain additional information, Burke telephoned Olivetti facilities in Denver, Seattle, San Francisco, Atlanta, New Orleans, and New York City, but could not locate anyone with direct experience with the DE-525 and its software manuals. Eventually Burke was successful in contacting a Mr. Valhon, an Olivetti employee in New Orleans. Valhon informed Burke he was preparing to install the same program for a customer in New Orleans and invited Burke to assist. At his own expense, Burke traveled to New Orleans and spent two days assisting Valhon. During the course of their work, Valhon made several handwritten corrections to the operations manuals, and Valhon provided Burke with several discs containing other revisions. Burke returned to Kansas City with this information but still could not get a general ledger program to function on either plaintiff's computer or the DE-525 at the Olivetti facility.

Burke resumed telephoning Olivetti facilities around the country for additional information. As a result, an individual with Atlanta Olivetti referred Burke to Walt Grambling, a former Olivetti employee who had purportedly programmed the system Burke was attempting to install on plaintiff's computer. Burke contacted Grambling at his place of business in North Carolina and arranged for Grambling to travel to Kansas City, where together they worked on plaintiff's computer for two and one-half days without success. At this point Burke offered to refund the $1,500 already paid by plaintiff, but was refused.

Due to the inability to get the computer to work satisfactorily, plaintiff's new president Patrick Scherzer called a meeting with Creach, Neese and Wildman. According to Creach and Scherzer, it was at this meeting that Neese informed them the DE-525 was incapable of performing the functions originally warranted. Neese then suggested that plaintiff sell its computer to a purchaser located by Olivetti for the sum of approximately $10,000 and purchase a new computer from Olivetti. Having paid out approximately $20,000 at the time, with another $11,000 owed on the contract with Executive, Scherzer refused Olivetti's offer. Plaintiff initiated this action on September 28, 1978.

Count II of plaintiff's petition asserted violation of express warranties and the implied warranty of merchantability, as set out in K.S.A. 84-2-313 and -314. It was on this theory the trial court granted relief to plaintiff.

The matter was tried to the court over a two-day period in July, 1980. Judgment was entered on February 3, 1981. At the close of plaintiff's evidence, the trial court ruled in favor of Executive's motion for involuntary dismissal, ordering all sums paid into court to be turned over to Executive. Generally, the findings of fact rendered by the court reflect a wholesale adoption of testimony offered by plaintiff's witnesses on direct examination. The court determined the computer sold to plaintiff was incapable of performing the functions warranted by Olivetti. As to damages, the court held:

"5. Plaintiff has been damaged in the full amount of the money it has had to pay to EFS, and in this case is entitled to pre-judgment interest on each payment from the date of said payment to February 1, 1981, at the rate of twelve percent (12%) per annum. That contract required the payment of $529.92 per month, commencing February 13, 1976, for sixty-one (61) months, plus a $1,990.00 payment for the sixty-second (62nd) month, and a payment of $1,024.00 at the outset. No prejudgment interest attaches to any payments made in the future by Olivetti on the EFS contract. Counsel for plaintiff is requested to furnish the amount for inclusion on the journal entry of judgment assessed against Olivetti including the amount of pre-judgment interest which will have accrued as of February 1, 1981, which is declared to be the effective date of this entire judgment. This amount should include all payments made by Schatz to EFS, the North Hills Bank, and the Clerk of the District Court whether paid by Schatz or the First State Bank.

"6. Plaintiff is also given judgment versus Olivetti for $1,000.00, the original payment made directly to Olivetti by Schatz, plus prejudgment interest at the rate of twelve percent (12%) per annum from December 23, 1975 to February 1, 1981, and counsel for plaintiff is directed to compute this figure also for inclusion in the journal entry of judgment effective February 1, 1981.

"7. Similarly, judgment is entered for plaintiff versus defendant Olivetti for $355.00 paid by plaintiff to Morasch Electric on 2-10-77, for $1,500.00 paid by plaintiff to Information Services International, Inc. (Mr. Burke) on 4-12-77 and for $1,786.02 paid by plaintiff to defendant Olivetti for a maintenance agreement on 5-11-77, all to bear pre-judgment interest at the rate of twelve percent (12%) per annum, and all of which are directed to be computed by plaintiff's attorney as of February 1, 1981, for inclusion in the journal entry of judgment effective as of that date.

"8. Plaintiff's request for allowance of damages for loss of use of the computer's services is denied as speculative.

"9. I find specifically that defendant breached its express warranty and the implied warranty of fitness for a particular purpose, and that defendant was unjustly enriched. Defendant's claim of lack of mitigation effort on the part of

plaintiff is likewise denied. The proposed sale, if it had ever been able to be consummated, was packaged to the purchase of still another Olivetti computer, and it is difficult to understand why the unused DE525 would have lost so much value in such a short period as to bring only $10,000.00. The requirement to mitigate does not require a subsequent sale at any price. Olivetti is directed to pick up its DE525."

The court rendered judgment in the total amount of $47,279.59, including prejudgment interest of $11,339.29.

Initially, defendant challenges the sufficiency of evidence to support a finding of breach of warranty.

"When a verdict or judgment is attacked for insufficiency of the evidence, the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below." *Marcotte Realty & Auction, Inc. v. Schumacher,* 229 Kan. 252, Syl. ¶ 1, 624 P.2d 420 (1981).

Accord, *International Petroleum Services, Inc. v. S & N Well Service, Inc.,* 230 Kan. 452, Syl. ¶ 8, 639 P.2d 29 (1982).

Essentially, defendant complains the evidence does not support the conclusion the computer had "hardware" defects which prevented it from functioning properly. The court determined that not only was the computer incapable of performing the functions warranted, but "would not function in a much more limited capacity, and was, in fact, worthless." Although no one testified the hardware was malfunctioning, a strong inference tending to prove that fact was created by the testimony of Burke concerning his extensive efforts to program the computer for a single function.

In any case, the gist of the court's decision was that the computer could not perform as warranted. This conclusion is amply supported by the testimony of Rex Babcock, a former Olivetti employee, that even assuming the hardware of the computer was in good order, it simply did not possess the capacity for data storage required to perform the many functions plaintiff desired and which defendant had guaranteed. Additionally, plaintiff's office manager and president testified that Neese admitted the computer lacked the capacity to carry out those functions. Accordingly, we find this issue to be without merit.

It is argued plaintiff is not entitled to recover as damages

interest paid on the lease purchase contract. K.S.A. 84-2-714 provides in part:

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

Subsection (2) is generally in accord with the common law concept that damages in case of a breach of warranty are ordinarily the difference between the value of the article delivered and what it would have been worth had it been as warranted. 67 Am. Jur. 2d, Sales §§ 740, 741. The court found the computer sold to plaintiff was not functional to any degree and was "worthless." Accordingly, the measure of damages in this case constitutes the difference between zero and the value the computer would have had if it had been as warranted—presumably the agreed-upon purchase price. Additionally, the court awarded plaintiff interest which it had paid under the contract with Executive.

K.S.A. 84-2-715 provides in relevant part:

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ."

As to those losses which are consequential, Official UCC Comment 2 states in part:

"Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The 'tacit agreement' test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise."

The common law rule has always been that damages recoverable for breach of contract are limited to those which may fairly be considered as arising, in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach. *Kansas State Bank v. Overseas Motosport, Inc.,* 222 Kan. 26, Syl. ¶ 1, 563 P.2d 414 (1977).

Neither party cites authority dealing directly with the issue of

whether interest expense may constitute consequential damages. This appears to be a question of first impression in this state. However, in *Coyle Chevrolet Co. v. Carrier,* _____ Ind. App. _____, 397 N.E.2d 1283 (1979), the defendant-automobile company appealed from judgment in favor of plaintiff-buyer on the theory of breach of warranty. Part of the appeal concerned judgment in favor of the buyer for sales tax and finance charges. The court stated:

"Coyle fails to comprehend the significance of the evidence relating to the sales tax and finance charge. The sales tax is clearly an incidental damage resulting from expenses 'reasonably incurred in . . . receipt' of the car. *Ind. Code.* 26-1-2-715. *Lloyd v. Classic Motor Coaches, Inc.,* 388 F. Supp. 785 (N.D. Ohio 1974). We recently held in *Hudson v. Dave McIntire, Inc.* (1979), Ind. App., 390 N.E.2d 179, 184, that finance charges could be included as a consequential damage.

"'Consequential damages are recoverable when they represent a loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know. Such damages should be direct, immediate and probable and not speculative. The determination of these damages is a question for resolution by the trier of fact. *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind. App. 632, 647, 648, 291 N.E.2d 92 mod. reh. den. 294 N.E.2d 617. This is a question of first impression in this state. However, we see no reason why this type of damage could not be assessed as a consequential damage where a buyer presents evidence that the seller had "reason to know" the buyer needed to borrow money in order to complete the purchase. See *Carl Beasley Ford, Inc. v. Burroughs Corporation,* 361 F. Supp. 325 (E.D. Pa. 1973), where such damages were awarded. *Id.* at 184, footnote 4.'

"Further, we note some jurisdictions consider the sales tax and finance charge as part of the price of the goods as warranted. *Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350, 4 Ill. Dec. 793, 360 N.E.2d 1168; *Thomas Chrysler Plymouth, Inc. v. Meyers* (1970), 48 Ala. App. 350, 264 So.2d 893." _____ Ind. App. at _____, 397 N.E.2d at 1286-87.

Although there is authority to the contrary [*Long v. Quality Mobile Home Brokers, Inc.,* 271 S.C. 482, 248 S.E.2d 311 (1978)], we find the reasoning in *Coyle* accords with the governing principles of the UCC on the subject of consequential damages. It was established by defendant's own witnesses that its agents were aware of plaintiff's need to finance the purchase of the computer. Indeed, defendant's salesman Neese arranged for the sale of the computer through Executive. No reason exists why interest paid Executive should not be considered and assessed as a component of consequential damages.

Defendant next asserts error in awarding prejudgment interest. As a general rule, prejudgment interest is not allowable on a claim

for unliquidated damages. This rule is subject to the qualification however, that where necessary to arrive at full compensation, a court may in the exercise of its discretion award interest or its equivalent as an element of damages even where the primary damages are unliquidated. *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, Syl. ¶¶ 10, 11, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977); *Schaefer & Associates v. Schirmer,* 3 Kan. App. 2d 114, Syl. ¶ 6, 590 P.2d 1087 (1979).

Here there exist two classifications of damages based on defendant's breach of warranty: (1) The difference at the time and place of acceptance between the actual value of the computer and the value the computer would have had if it had been as warranted (K.S.A. 84-2-714[2]); and (2) consequential damages resulting from seller's breach (84-2-714[3], -715[2][a]).

Although plaintiff claimed as damages under the first classification all moneys paid on the principal of the purchase price, the exact measure of damages could not be ascertained until the court had determined, at the least, the actual market value of the computer. In *Lightcap* the court responded to a substantially similar situation where presented with the question of whether the court had correctly withheld an award of prejudgment interest on royalties due.

"As to the amounts which were determined to be due only when judgment was entered below, we believe the general rule as to unliquidated claims should apply. Apart from the question of liability (one of 'initial impression' as noted by the trial court), the amount due if there was liability was not determined until judgment. The 'market value' of the gas sold was subject to proof at trial by any competent evidence. [Citations omitted.] Here plaintiff chose to rely on the arbitrated value as establishing market value, and that figure was accepted by the trial court in the absence of any other evidence on the issue. *Such a result, however, could not have been foretold before this litigation was well under way, and until that time the total claim was unliquidated.*" 221 Kan. at 467; emphasis added.

Here damages awarded under K.S.A. 84-2-714(2) were unliquidated where the actual value of the computer was uncertain. The trial court should not have awarded prejudgment interest on the principal obligation incurred for the computer.

Items of consequential damages awarded plaintiff, *e.g.,* electrical wiring, maintenance agreement, finance charges, and programming fees, were sums certain in amount with the issue of defendant's liability being the sole determinant of whether they would be allowed or denied in full. Here prejudgment interest was warranted.

Defendant argues plaintiff failed to mitigate damages: (1) by refusing Olivetti's offer to effect a resale of the computer; and (2) in not taking back the $1,500 paid to Burke, as offered. While the first of these arguments was presented to the trial court, the second was not. Thus, whether plaintiff failed in its duty to mitigate damages by refusing Burke's offer to refund programming fees is a matter beyond this court's ability to consider. *Anderson v. Overland Park Credit Union,* 231 Kan. 97, Syl. ¶ 6, 643 P.2d 120 (1982).

In denying defendant's claim that plaintiff failed to mitigate by refusing to offer to effect a resale, the court stated:

"Defendant's claim of lack of mitigation effort on the part of plaintiff is likewise denied. The proposed sale, if it had ever been able to be consummated, was packaged to the purchase of still another Olivetti computer, and it is difficult to understand why the unused DE525 would have lost so much value in such a short period as to bring only $10,000.00. The requirement to mitigate does not require a subsequent sale at any price."

This finding is amply supported by the evidence.

Prejudgment interest was awarded at the rate of 12 percent per annum and it appears the court was in error in doing so. The record reveals that consequential damages allowable in this case were incurred in 1976 and 1977, and accordingly interest on those amounts should have been at the rate of 6 percent per annum to July 1, 1980. K.S.A. 16-201 (Weeks); *Equity Investors, Inc. v. Academy Ins. Group, Inc.,* 229 Kan. 456, 625 P.2d 466 (1981); *Jerry L. Phillips, Inc. v. Ratley,* 6 Kan. App. 2d 157, 627 P.2d 339 (1981). From and after July 1, 1980, prejudgment interest should have been assessed at the rate of 10 percent per annum. The judgment as entered should be modified accordingly.

This cause is remanded to the trial court with directions to modify its judgment by (1) deletion of prejudgment interest on the principal of purchase money paid by plaintiff to Executive Financial Services, Inc., and (2) by recomputation and an award of prejudgment interest on consequential damages at rates and in the manner herein set forth. In all other respects, the judgment is affirmed.