[No. 7072-7-III.   Division Three.   January 22, 1987.]

AUBREY'S R. V. CENTER, INC., *Respondent,* v. TANDY CORPORATION, *Appellant.*

596

*West Harrison Campbell, J. Tappan Menard,* and *Gavin, Robinson, Kendrick, Redman & Pratt,* for appellant.

*Wade E. Gano, Donald E. Templeton,* and *Thorner, Kennedy, Gano & Rowley, P.S.,* for respondent.

MUNSON, J.—Aubrey's Recreational Vehicle Center, Inc., purchased a computer system from Tandy Corporation to perform certain functions. When the system failed to perform those functions, Aubrey's brought this action; the trial court rescinded the contract, awarded Aubrey's damages, and found Tandy had violated the Consumer Protection Act. Tandy appeals. We affirm in part and reverse in part.

The facts are, for the most part, undisputed. In April 1983, Aubrey Reeves, Jr., president and owner of Aubrey's, contacted the Radio Shack Computer Center about pur-

chasing a computer system for his business. Radio Shack is the local retailer for products sold by Tandy, its parent company. Mr. Reeves communicated his desire to purchase an integrated computer system which, among other functions, could: (1) maintain an inventory for over 3,000 different items while also operating as a point–of–sale recorder; (2) maintain a customer list; (3) compute and print retail installment sales contracts; (4) compute and maintain accounts payable and receivable; and (5) maintain a general ledger. Negotiations ensued thereafter between Mr. Reeves and Larry Momo, a Radio Shack salesman.

After Mr. Reeves explained the extent of Aubrey's inventory control needs, Mr. Momo determined Tandy did not have the necessary software to perform the required inventory tracking functions. He referred Mr. Reeves to the *Application Software Source Book* (Source Book) which catalogs various programs manufactured by third parties and compatible with Tandy computers. Because Tandy neither reviews nor tests those programs, it has a policy of not supporting or servicing such software. A disclaimer to this effect is printed in the Source Book. At trial, Mr. Momo was unable to recall whether he showed Mr. Reeves the disclaimer; however, he testified he informed Mr. Reeves several times that Tandy would not support any programs purchased from the book. Mr. Reeves, on the other hand, testified he was never told Tandy "wouldn't stand behind" the Source Book's software.

In any event, after consulting the Source Book, Messrs. Momo and Reeves discovered Lizcon Trading Company of Salt Lake City, Utah, manufactured an inventory control program compatible with Tandy computers. Mr. Momo obtained a brochure from Lizcon outlining the capabilities of the inventory software.

During these negotiations, Aubrey's arranged financing for the computer system through Dolsen Leasing Company on a lease–purchase contract. Dolsen agreed to purchase the system from Tandy; Aubrey's agreed to make regular payments (including interest) to Dolsen; at the end of the

lease, Aubrey's was given the option of purchasing the system, an option Mr. Reeves intended to exercise. Mr. Reeves discussed this financing arrangement with Mr. Momo prior to the sale; thus, Tandy knew Aubrey's financed the sale through the lease arrangement with Dolsen.

On April 30, 1983, Mr. Momo sent Mr. Reeves a written proposal; Tandy was to supply the hardware (computers) and substantially all of the software necessary for Aubrey's needs; the point–of–sale/inventory control functions were to be performed by software acquired from Lizcon.

Aubrey's accepted Tandy's proposal; Dolsen purchased the computer hardware and software, except for the Lizcon program, from Tandy for $10,887.55. Aubrey's acquired the inventory program directly from Lizcon for $499 with Mr. Momo acting as agent. The equipment was delivered directly from Tandy to Aubrey's in late May.

Upon delivery, Mr. Reeves' wife and daughter, both novices with respect to computers, attempted to bring the various programs on line. They immediately encountered problems with the retail installment contract and Lizcon programs. The Lizcon program was unable to inventory more than approximately 600 items at one time; it would not act as a point–of–sale recorder. Likewise, the program designed to compute the retail sales contracts did not work; it could not perform exponential calculations. Both the general ledger and the accounts payable programs worked as represented.

Following their attempts to solve the various problems, Aubrey's contacted Mr. Momo about 2 months after delivery of the system. His attempt to rectify the various problems throughout the summer and into the fall was to no avail. Mr. Momo then retrieved the Lizcon program with the intent to send it to Lizcon for alteration. By March 1984, Tandy had failed to return the Lizcon program to Aubrey's.

On March 13, Aubrey's sent a letter to Tandy, asking for rescission of the contract and return of the purchase price. Aubrey's was contacted by the manager of Tandy's cus-

tomer relations for the computer service division. Following the ensuing negotiations, Tandy agreed to exchange the hardware supplied to Aubrey's for a different model. Tandy also agreed to resolve the continuing problems with the Lizcon program and to create a program to handle Aubrey's requirements with regard to the retail installment sales contracts. Mr. Momo subsequently informed Mr. Reeves that Tandy had authorized him to create a new retail sales contract program, which would also meet Aubrey's needs.

The Lizcon program was apparently modified, but never returned to Aubrey's. When Mr. Momo inquired into the program's status, he was instructed "that the Legal Department out of Fort Worth [Tandy's headquarters] [would] handle it," and he was not to "have any more contact". He was also ordered to cease working on the retail sales program. Neither Mr. Momo nor any other Tandy representative informed Aubrey's that it had chosen to stop attempts at resolving the system's problems.

By June 1984, realizing Tandy was no longer attempting to rectify the computer system's problems, Aubrey's filed this action for rescission and damages. Following a bench trial, the court entered findings of fact, conclusions of law, and judgment in favor of Aubrey's. Specifically, the court rescinded the contract and awarded Aubrey's damages in the amount of $29,981.28, which included the purchase price of the computer hardware and software, finance charges incurred to Dolsen, various other expenses incurred by Aubrey's in its attempts to bring the system on line, plus attorney fees. The court also found that Tandy's actions constituted a breach of the CPA and awarded Aubrey's an additional $1,000 damages. Tandy appeals.

I

REVOCATION OF ACCEPTANCE

Tandy's first assignment of error essentially incorporates four issues: (1) whether rescission is available as a remedy under the Uniform Commercial Code (UCC), RCW 62A; (2) whether the defects in the Lizcon and retail sales contract

programs "substantially impaired" the value of the computer system to Aubrey's; (3) whether Aubrey's gave timely notice of revocation of acceptance; and (4) if Aubrey's notice of revocation was timely, whether it waived such revocation by continuing to use part of the hardware and software up until the date of trial. We analyze these issues separately.

## A
### RESCISSION AS A PROPER REMEDY

█ Tandy maintains the UCC does not recognize rescission as a remedy and, thus, it is not available in this action. Both parties agree the provisions of the UCC are applicable. *See* RCW 62A.2–102. Although Tandy correctly contends the term "rescission" is not found in the UCC, RCW 62A.2–608 provides for revocation of acceptance, *i.e.*, the "Code's version of the common–law remedy of rescission." *Computerized Radiological Servs., Inc. v. Syntex Corp.,* 595 F. Supp. 1495, 1510 (E.D.N.Y. 1984); *see also* J. White & R. Summers, *Uniform Commercial Code* § 8–1, at 293–95 (2d ed. 1980). That RCW 62A.2–608 encompasses the concept of rescission is supported by Official Comment 1 to section .2–608 as well as past Washington decisions.[1]

Although the prior basic policy is continued, the buyer is *no longer required to elect between revocation of acceptance and recovery of damages for breach.* Both are now available to him. . . . The section no longer

---

[1]*See, e.g., Blake v. Federal Way Cycle Ctr.,* 40 Wn. App. 302, 306, 698 P.2d 578 (court affirmed right to rescind under RCW 62A.2–608), *review denied,* 104 Wn.2d 1005 (1985); *Tallmadge v. Aurora Chrysler Plymouth, Inc.,* 25 Wn. App. 90, 94, 605 P.2d 1275 (1979) ("in certain circumstances a buyer may 'rescind' or 'revoke acceptance' under RCW 62A.2–608"); *Melby v. Hawkins Pontiac, Inc.,* 13 Wn. App. 745, 749–50, 537 P.2d 807 (1975) (action for both rescission and damages was proper under the UCC); *DeCoria v. Red's Trailer Mart, Inc.,* 5 Wn. App. 892, 894, 491 P.2d 241 (1971) (tender back of goods not a condition precedent to action for rescission under the UCC); *Pedrini v. Mid–City Trailer Depot, Inc.,* 1 Wn. App. 56, 59, 459 P.2d 76 (1969) (decree granting rescission properly allowed under the UCC). *But cf.* J. White & R. Summers, at 295 ("It is the apparent intention of the drafters to restrict the word rescission to a rather limited number of cases, those involving a mistake or in which the seller has committed fraud, duress, or the like.").

speaks of "rescission," a term capable of ambiguous application either to transfer of title to the goods or to the contract of sale and susceptible also of confusion with cancellation for cause of an executed or executory portion of the contract. *The remedy under this section is instead referred to simply as "revocation of acceptance" of goods tendered under a contract for sale and involves no suggestion of "election" of any sort.*

(Italics ours.) Official Comment 1, RCWA 62A.2–608. Although section .2–608 reflects a liberalization of the common law remedy of rescission, the function of rescission lives on under the phrase "revocation of acceptance." Although technically Aubrey's should have asked for revocation of acceptance, refusal to grant that remedy simply because the buyer alleged rescission is excessively technical and overly formalistic. Aubrey's request for "rescission" is essentially an allegation of "revocation of acceptance." *See Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wn. App. 39, 48, 554 P.2d 349, 83 A.L.R.3d 680 (1976).

## B
### SUBSTANTIAL IMPAIRMENT

Tandy contends even if the court granted the proper remedy, the requirements for a revocation of acceptance were not met. RCW 62A.2–608(1) provides:

The buyer may revoke his acceptance of a lot or commercial unit whose non–conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non–conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non–conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Tandy contends the evidence does not support a finding the software's nonconformities substantially impaired the value of the computer system as a whole, since only the Lizcon and retail sales contract software failed to perform as represented. We disagree.

■ Whether a nonconformity in goods substantially impairs their value is determined objectively with reference to the buyer's particular circumstances, rather than his or her unarticulated subjective desires. *Hays Merchandise, Inc. v. Dewey,* 78 Wn.2d 343, 347, 474 P.2d 270 (1970); *Thomas v. Ruddell Lease–Sales, Inc.,* 43 Wn. App. 208, 215, 716 P.2d 911 (1986); *Massingale v. Northwest Cortez, Inc.,* 27 Wn. App. 749, 752, 620 P.2d 1009 (1980), *review denied,* 95 Wn.2d 1009 (1981). Whether goods are substantially impaired is a factual question, *Hays,* at 347; such a finding will not be disturbed on appeal if supported by substantial evidence. *Massingale,* at 752–53.

The evidence indicates: (1) Aubrey's wanted an integrated system capable of performing a series of related functions; (2) Aubrey's was impressed with this system's represented ability to perform point–of–sale/inventory control and retail sales computation functions; (3) Tandy knew the system's ability to perform those functions was the principal reason Aubrey's purchased the system; and (4) neither the Lizcon nor the retail sales program functioned as represented. Although the hardware and two other minor programs did perform as represented, the system, represented as an integrated whole, did not. The evidence supports a finding of substantial impairment.

## C
### Timely Revocation

Tandy also asserts Aubrey's failed to give seasonable notice of revocation of acceptance. We disagree. RCW 62A.2–608(2) declares:

> Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

■ RCW 62A.2–608(2) does not require the notice to be in any particular form. *Hays,* at 348; *Fenton v. Contemporary Dev. Co.,* 12 Wn. App. 345, 348, 529 P.2d 883 (1974),

*review denied,* 85 Wn.2d 1007 (1975). Such notice may be implied, in fact, from conduct. *Fenton,* at 348; *see Testo,* at 49. What constitutes a reasonable time in which to give notice is a question of fact to be determined from the particular circumstances of the case. *See DeCoria v. Red's Trailer Mart, Inc.,* 5 Wn. App. 892, 895, 491 P.2d 241 (1971); *Solomon Refrigeration, Inc. v. Osburn,* 148 Ga. App. 772, 252 S.E.2d 686, 690 (1979).

Official Comment 4 to RCWA 62A.2–608 recognizes that

this remedy will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non–conformity after acceptance and beyond the time for rejection after tender.

Official Comment 5 continues in part:

The content of the notice under subsection (2) is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment. . . . Following the general policy of this Article, the requirements of the content of notification are less stringent in the case of a non–merchant buyer.

Although the time between Aubrey's acceptance in May 1983 and the letter asking for rescission was approximately 9 months, under the circumstances of this case the time frame was reasonable. The initial 2–month period may be attributed to the fact the Reeves, as computer novices, failed to immediately understand the problems were not simply bugs to be worked out as the programs were brought on line; once it became clear the computer programs were incapable of those functions, Aubrey's immediately contacted Radio Shack with various complaints. Thereafter, the record indicates a continuing series of complaints, negotiations, promises, and repeated attempts by Tandy to adapt the software to the hardware. After Tandy had ceased further attempts to rectify the software problems (a decision not communicated to Aubrey's), Aubrey's initiated this action.

Aubrey's, in good faith, allowed Tandy an extended

period in which to cure or repair these problems; Aubrey's should not be penalized for its continued patience. Revocation of acceptance was seasonably given.[2]

## D
### WAIVER OF REVOCATION

Tandy also argues Aubrey's waived revocation of acceptance by continuing to use some of the software after sending the March 13 letter of revocation. Whether continued use of the goods after notification vitiates the revocation depends on the reasonableness of that use. *Mobile Home Sales Management, Inc. v. Brown*, 115 Ariz. 11, 562 P.2d 1378, 1383–84 (Ct. App. 1977); *Johannsen v. Minnesota Vly. Ford Tractor Co.*, 304 N.W.2d 654, 658 (Minn. 1981); *Pavesi v. Ford Motor Co.*, 155 N.J. Super. 373, 382 A.2d 954, 957 (1978); *McCullough v. Bill Swad Chrysler–Plymouth, Inc.*, 5 Ohio St. 3d 181, 449 N.E.2d 1289, 1292 (1983). Whether such use is reasonable is a question of fact. *McCullough*, at 183.

■ *McCullough*, at 184, provides that in ascertaining whether a continued use of goods after revocation is reasonable, reference should be made to the following five factors:

(1) Upon being apprised of the buyer's revocation of his acceptance, what instructions, if any, did the seller tender the buyer concerning return of the now rejected goods? (2) Did the buyer's business needs or personal circumstances compel the continued use? (3) During the period of such use, did the seller persist in assuring the buyer that all nonconformities would be cured or that provisions would otherwise be made to recompense the latter for the dissatisfaction and inconvenience which the defects caused him? (4) Did the seller act in good faith?

---

[2]*See, e.g., Butcher v. Garrett–Enumclaw Co.*, 20 Wn. App. 361, 377, 581 P.2d 1352, *review denied*, 91 Wn.2d 1004 (1978); *CMI Corp. v. Leemar Steel Co.*, 733 F.2d 1410, 1415 (10th Cir. 1984); *Ford Motor Credit Co. v. Harper*, 671 F.2d 1117, 1124 (8th Cir. 1982); *Computerized Radiological Servs., Inc.*, at 1511; *Jensen v. Seigel Mobile Homes Group*, 105 Idaho 189, 668 P.2d 65, 69 (1983); *Newmaster v. Southeast Equip., Inc.*, 231 Kan. 466, 646 P.2d 488, 492 (1982); *Holland v. Dick Youngberg Chevrolet–Buick, Inc.*, 348 N.W.2d 770, 775–76 (Minn. Ct. App. 1984).

(5) Was the seller unduly prejudiced by the buyer's continued use?

(Citation omitted.)

First, upon receiving the March 13 letter asking for rescission, Tandy did not demand return of the computer hardware or the remaining software; Tandy never indicated it would return the purchase price in exchange for the goods; tender of goods by Aubrey's to Tandy was not necessary prior to trial. *Testo,* at 49 (quoting 2 R. Anderson, *Uniform Commercial Code* § 2–608:18, at 246 (2d ed. 1971)). Second, whether Aubrey's business needs compelled continued use is unclear. Third, Tandy assured Aubrey's it would cure the defects. Fourth, Tandy's good faith is questionable as it ceased all attempts to fix the programs without informing Aubrey's. Finally, Tandy does not allege Aubrey's continued use of the computer prejudices its rights; it does not contend the retrieved goods have been damaged or lost their value. We find Aubrey's continued use of the system was not inconsistent with the prior revocation of acceptance. However, retention and continued use beyond the time this judgment is satisfied is unacceptable. *See Barnard v. Compugraphic Corp.,* 35 Wn. App. 414, 419, 667 P.2d 117 (1983).[3]

## II

### FINANCE CHARGES AS DAMAGES

Tandy's second assignment of error contends the trial court erred by awarding Aubrey's the finance charges it incurred to Dolsen in addition to the actual purchase price of the computer. The trial court found, in relevant part:

> That the direct loss to the plaintiff as a result of the *breach of warranty* by the defendant consists of:
> A. All payments actually made by the plaintiff to Dolsen Leasing in the amount of $7,693.48 at time of trial.
> B. The contracted future payments to Dolsen to be

---

[3]Tandy has not sought a reasonable rental value for use of the equipment for the time it was in Aubrey's possession after revocation.

> made by the plaintiff in the amount of $9,325.62. If the payoff of this amount is less, the defendant is to receive the credit.

(Italics ours.)

Tandy, relying primarily on *Barnard v. Compugraphic Corp., supra,* contends finance charges or interest payments are not recoverable as consequential damages in actions for breach of warranty or revocation of acceptance; it asserts the maximum amount of recovery was the purchase or "cash" price of the system ($10,887.55), plus incidental and consequential damages arising from the breach of warranty. RCW 62A.2–714(2), .2–715.

In *Barnard,* at 420, this court agreed in dicta with the trial court's determination that a buyer seeking damages under section .2–714(2) for breach of warranty is not entitled to recover consequential damages in the form of finance charges incurred on money borrowed to finance the purchase of goods.

> Although some courts have held otherwise, we agree with those cases which hold interest is not a part of the value of the goods as warranted or consequential damages arising from the defendant's breach, but is merely the cost of money borrowed to buy goods because capital is unavailable to the purchaser. *Chatlos Sys., Inc. v. National Cash Register Corp.,* 635 F.2d 1081 (3d Cir. 1980); *Long v. Quality Mobile Home Brokers, Inc.,* 271 S.C. 482, 248 S.E.2d 311 (1978). . . .
>
> Here, interest on the money borrowed to purchase the EditWriter would have been incurred by the Barnards whether the machine conformed or was defective. Consequently, the interest charges did not arise from Compugraphic's breach.

(Citations omitted.) *See Bendix Home Sys., Inc. v. Jessop,* 644 P.2d 843, 846 (Alaska 1982); J. White & R. Summers, at 380 n.18.

The focus of RCW 62A.2–714's basic measure of damages, *i.e.,* the difference between the value of goods as accepted and the value of goods as warranted, is based on the rationale a buyer should only be given the benefit of his or her bargain and nothing more. Consequently, the buyer's

measure of recovery is limited to the difference in value, plus incidental and consequential damages foreseeably *arising from* the breach of warranty. *See* RCW 62A.2–714(2), .2–715. The inclusion of finance charges within section .2–714's basic measure of damages overcompensates the buyer. Likewise, finance charges are not includable as incidental or consequential damages as they do not result from or arise incident to the breach.

 The objective behind awarding damages to a buyer who justifiably revokes acceptance is different.[4] There, the buyer is not merely seeking the benefit of his or her bargain. Rather, the buyer seeks to be restored to the position he or she would have been in if the contract had never been entered into. Thus, the objective of this remedy is primarily restitution. The measure of damages used to achieve this goal entitles the buyer not only to the return of the purchase price, RCW 62A.2–711(1), but also any expenses incurred by the buyer in reasonable reliance upon the contract, plus incidental and consequential damages arising from the breach. *See* D. Dobbs, *Remedies* § 12.17, at 879 (1973); R. Nordstrom, *Sales* § 150, at 457 (1970); 5 A. Corbin, *Contracts* § 996, at 16 n.10 (1964 & Supp. 1980).

A buyer is not returned to the "precontract" position if he or she is not allowed, in a proper case, to claim any additional amount he or she has incurred in reliance on the contract. If held otherwise, the buyer, here, not only does not have the goods, but remains liable for finance charges. *Cf.* R. Nordstrom, at 457–58 (under RCW 62A.2–714 the buyer is assumed to retain and thus be able to use the nonconforming goods). Although compensated for the con-

---

[4]It should be noted that these remedies are exclusive. *See* J. White & R. Summers, at 375 ("only buyers who have accepted and neither rightfully rejected nor effectively revoked can use 2–714."); *Gawlick v. American Builders Supply, Inc.,* 86 N.M. 77, 519 P.2d 313, 314 (1974) (section .2–714 not available to a buyer who has effectively revoked acceptance); *Desilets Granite Co. v. Stone Equalizer Corp.,* 133 Vt. 372, 340 A.2d 65, 67 (1975) (when buyers attempted revocation ineffective, section .2–714 governs measure of damages). Put another way, section .2–714, unlike section .2–608, contemplates something less than what at common law was known as a "total" breach.

tract price of the goods, the buyer suffers out-of-pocket damages in the amount of interest paid to the financier. We conclude the court properly awarded Aubrey's not only the contract price, but also the finance charges less any amount saved if Dolsen releases Aubrey's from future finance charges.[5] *See Carl Beasley Ford, Inc. v. Burroughs Corp.*, 361 F. Supp. 325, 334 (E.D. Pa. 1973), *aff'd without opinion*, 493 F.2d 1400 (3d Cir. 1974). *Cf. Coyle Chevrolet Co. v. Carrier*, 397 N.E.2d 1283, 1286-87 (Ind. Ct. App. 1979) (interest or finance charges allowed although seeking damages pursuant to section .2-714); *Schatz Distrib. Co. v. Olivetti Corp. of Am.*, 7 Kan. App. 2d 676, 647 P.2d 820, 825-26 (1982); *Distco Laminating, Inc. v. Union Tool Corp.*, 81 Mich. App. 612, 265 N.W.2d 768, 773 (1978); *Thompson Chrysler-Plymouth, Inc. v. Myers*, 48 Ala. App. 350, 264 So. 2d 893, 895-96 (1972); *Burrus v. Itek Corp.*, 46 Ill. App. 3d 350, 360 N.E.2d 1168, 1172 (1977).

## III
### Consumer Protection Act

Finally, Tandy assigns error to the trial court's determination its actions constituted a violation of the Consumer Protection Act, RCW 19.86. Tandy asserts the evidence merely shows a single, isolated act arising from a misunderstanding between the parties and thus maintains Aubrey's failed to demonstrate (1) its activities were unfair or deceptive or (2) impacted the public interest. We agree. At the time of trial, the test for bringing a private action under the CPA was set out in *Anhold v. Daniels*, 94 Wn.2d 40, 45, 614 P.2d 184 (1980). However, since the filing of the parties' briefs in this case, our Supreme Court has changed the elements necessary for finding a CPA violation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). The elements of the new test are: (1) an unfair or deceptive act or practice; (2)

---

[5]Aubrey's advised at oral argument all lease payments to Dolsen were completed by that time. Whether the option to purchase had been exercised was not stated.

occurring within trade or business; (3) affecting the public interest; (4) causing the plaintiff injury to business or property; and (5) causation between the deceptive act and the resulting injury. Comparing the *Hangman Ridge* elements to those in *Anhold,* we conclude *Hangman Ridge* merely refines past decisional law; thus, we apply that test retroactively to the facts in this case.

First, the act does not define what constitutes an unfair or deceptive act or practice. However, *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 592, 675 P.2d 193 (1983) provides conduct may be unfair or deceptive "so long as the action has the capacity to deceive a substantial portion of the public"; intent to deceive need not be shown. Here, the Lizcon program was represented by Mr. Momo to fulfill Aubrey's needs. Substantial evidence supports the finding he failed to inform Mr. Reeves the Lizcon program was not warranted or otherwise supported by Tandy. Failure to inform potential buyers of Source Book software that those programs were not backed by Tandy has the "capacity to deceive." Thus, the first prong of the *Hangman Ridge* test is met.

Second, the remaining question is whether Tandy's actions here impact the public's interest. Where the resulting injury arises from an essentially consumer transaction, as the instant case, the public interest may be demonstrated by reference to the following factors:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman Ridge,* at 790.

■ Applying those factors, the alleged act did occur within the course of the defendant's business. However, the acts were not shown to be part of a generalized course of

conduct, nor was there a showing of repeated acts; there is little likelihood of repetition; mere speculation that there might be is insufficient to show a potential for repetition. *Eastlake Constr. Co. v. Hess,* 102 Wn.2d 30, 52, 686 P.2d 465 (1984). No other consumers were affected by the conduct. Thus, we conclude there is no showing of public interest under the *Hangman Ridge* test.

We affirm all but the court's determination that Tandy's actions violated the CPA. The court's award of $1,000, plus attorney fees pursuant to the CPA, is ordered deducted from Aubrey's judgment. Each party shall bear its own costs and attorney fees on appeal.

McINTURFF, C.J., and THOMPSON, J., concur.

Reconsideration denied March 3, 1987.