998 P.2d 305 (2000)
140 Wash.2d 568
M.A. MORTENSON COMPANY, INC., Petitioner,
v.
TIMBERLINE SOFTWARE CORPORATION and Softworks Data Systems, Inc., Respondents.
No. 67796-4.
Supreme Court of Washington, En Banc.
Argued October 26, 1999.
Decided May 4, 2000.
Reconsideration Denied July 11, 2000.
*307 Preston, Gates & Ellis, Robert B. Mitchell, Mark Wittow, Seattle, Amicus Curiae on Behalf of Business Software Alliance.
Oles, Morrison, Rinker & Baker, Bradley L. Powell, Seattle, Williams & Williams, Catherine C. Clark, Kenmore, Sheppad, Mullin, Richter & Hampton, Theodore Russell, San Francisco, CA, for Petitioner.
Peery, Hiscock, Pierson & Ryder, Charles E. Peery, Michael E. Ricketts, Groff & Murphy, Michael Porter Grace, Seattle, Laura P. Knechtel, Federal Way, for Respondents.
*306 JOHNSON, J.
This case presents the issue of whether a limitation on consequential damages enclosed in a "shrinkwrap license" accompanying computer software is enforceable against the purchaser of the licensed software. Petitioner M.A. Mortenson Company, Inc. (Mortenson), a general construction contractor, purchased licensed computer software from Timberline Software Corporation (Timberline) through Softworks Data Systems, Inc. (Softworks), Timberline's local authorized dealer. After Mortenson used the program to prepare a construction bid and discovered the bid was $1.95 million less than it should have been, Mortenson sued Timberline for breach of warranties alleging the software was defective. The trial court granted Timberline's motion for summary judgment. The Court of Appeals affirmed the order of summary judgment, holding (1) the purchase order between the parties was not an integrated contract; (2) the licensing agreement set forth in the software packaging and instruction manuals was part of the contract between Mortenson and Timberline; and (3) the provision limiting Mortenson's damages to recovery of the purchase price was not unconscionable. M.A. Mortenson Co. v. Timberline Software Corp., 93 Wash.App. 819, 826-37, 970 P.2d 803 (1999). We granted Mortenson's petition for review and affirm the Court of Appeals.

FACTS
Petitioner Mortenson is a nationwide construction contractor with its corporate headquarters in Minnesota and numerous regional offices, including a northwest regional office in Bellevue, Washington. Respondent Timberline is a software developer located in Beaverton, Oregon. Respondent Softworks, an authorized dealer for Timberline, is located in Kirkland, Washington and provides computer-related services to contractors such as Mortenson.
Since at least 1990, Mortenson has used Timberline's Bid Analysis software to assist with its preparation of bids.[1] Mortenson had used Medallion, an earlier version of Bid Analysis, at its Minnesota headquarters and its regional offices. In early 1993, Mortenson installed a new computer network operating system at its Bellevue office and contacted Mark Reich (Reich), president of Softworks, to reinstall Medallion. Reich discovered, however, that the Medallion software was incompatible with Mortenson's new operating system. Reich informed Mortenson that Precision, a newer version of Bid Analysis, was compatible with its new operating system.
Mortenson wanted multiple copies of the new software for its offices, including copies for its corporate headquarters in Minnesota and its northwest regional office in Bellevue. Reich informed Mortenson he would place an order with Timberline and would deliver eight copies of the Precision software to the Bellevue office, after which Mortenson could distribute the copies among its offices.
After Reich provided Mortenson with a price quote, Mortenson issued a purchase order dated July 12, 1993, confirming the agreed upon purchase price, set up fee, delivery charges, and sales tax for eight copies of the software.[2] The purchase order indicated that Softworks, on behalf of Timberline, *308 would "[f]urnish current versions of Timberline Precision Bid Analysis Program Software and Keys" and "[p]rovide assistance in installation and system configuration for Mortenson's Bellevue Office." Clerk's Papers at 206. The purchase order also contained the following notations:
Provide software support in converting Mortenson's existing Bid Day Master Files to a format accepted by the newly purchased Bid Day software. This work shall be accomplished on a time and material basis of $85.00 per hour. Format information of conversion of existing D-Base Files to be shared to assist Mortenson Mid-West programmers in file conversion.
-System software support and upgrades to be available from Timberline for newly purchased versions of Bid Day Multi-User.
-At some future date should Timberline upgrade "Bid Day" to a windows version, M.A. Mortenson would be able to upgrade to this system with Timberline crediting existing software purchase toward that upgrade on a pro-rated basis to be determined later.
Clerk's Papers at 206. Below the signature line the following was stated: "ADVISE PURCHASING PROMPTLY IF UNABLE TO SHIP AS REQUIRED. EACH SHIPMENT MUST INCLUDE A PACKING LIST. SUBSTITUTIONS OF GOODS OR CHANGES IN COSTS REQUIRE OUR PRIOR APPROVAL." Clerk's Papers at 206.[3] The purchase order did not contain an integration clause.
Reich signed the purchase order and ordered the requested software from Timberline. When Reich received the software, he opened the three large shipping boxes and checked the contents against the packing invoice. Contained inside the shipping boxes were several smaller boxes, containing program diskettes in plastic pouches, installation instructions, and user manuals. One of the larger boxes also contained the sealed protection devices for the software.[4]
All Timberline software is distributed to its users under license. Both Medallion and Precision Bid Analysis are licensed Timberline products. In the case of the Mortenson shipment, the full text of Timberline's license agreement was set forth on the outside of each diskette pouch and the inside cover of the instruction manuals. The first screen that appears each time the program is used also references the license and states, "[t]his software is licensed for exclusive use by: Timberline Use Only." Clerk's Papers at 302. Further, a license to use the protection device was wrapped around each of the devices shipped to Mortenson. The following warning preceded the terms of the license agreement:
CAREFULLY READ THE FOLLOWING TERMS AND CONDITIONS BEFORE USING THE PROGRAMS. USE OF THE PROGRAMS INDICATES YOUR ACKNOWLEDGEMENT THAT YOU HAVE READ THIS LICENSE, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS. IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, PROMPTLY RETURN THE PROGRAMS AND USER MANUALS TO THE PLACE OF PURCHASE AND YOUR PURCHASE PRICE WILL BE REFUNDED. YOU AGREE THAT YOUR USE OF THE PROGRAM ACKNOWLEDGES THAT YOU HAVE READ THIS LICENSE, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.
Clerk's Papers at 305. Under a separate subheading, the license agreement limited Mortenson's remedies and provided:
LIMITATION OF REMEDIES AND LIABILITY

NEITHER TIMBERLINE NOR ANYONE ELSE WHO HAS BEEN INVOLVED IN THE CREATION, PRODUCTION OR DELIVERY OF THE PROGRAMS OR USER MANUALS

*309 SHALL BE LIABLE TO YOU FOR ANY DAMAGES OF ANY TYPE, INCLUDING BUT NOT LIMITED TO, ANY LOST PROFITS, LOST SAVINGS, LOSS OF ANTICIPATED BENEFITS, OR OTHER INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE SUCH PROGRAMS, WHETHER ARISING OUT OF CONTRACT, NEGLIGENCE, STRICT TORT, OR UNDER ANY WARRANTY, OR OTHERWISE, EVEN IF TIMBERLINE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR FOR ANY OTHER CLAIM BY ANY OTHER PARTY. TIMBERLINE'S LIABILITY FOR DAMAGES IN NO EVENT SHALL EXCEED THE LICENSE FEE PAID FOR THE RIGHT TO USE THE PROGRAMS.
Clerk's Papers at 305.
Reich personally delivered the software to Mortenson's Bellevue office, and was asked to return at a later date for installation. The parties dispute what happened next. According to Neal Ruud (Ruud), Mortenson's chief estimator at its Bellevue office, when Reich arrived to install the software Reich personally opened the smaller product boxes contained within the large shipping boxes and also opened the diskette packaging. Reich inserted the diskettes into the computer, initiated the program, contacted Timberline to receive the activation codes, and wrote down the codes for Mortenson. Reich then started the programs and determined to the best of his knowledge they were operating properly. Ruud states that Mortenson never saw any of the licensing information described above, or any of the manuals that accompanied the software. Ruud adds that copies of the programs purchased for other Mortenson offices were forwarded to those offices.
Reich claims when he arrived at Mortenson's Bellevue office he noticed the software had been opened and had been placed on a desk, along with a manual and a protection device. Reich states he told Mortenson he would install the program at a single workstation and "then they would do the rest." Clerk's Papers at 176. Reich proceeded to install the software and a Mortenson employee attached the protection device. Reich claims he initiated and ran the program, and then observed as a Mortenson employee repeated the installation process on a second computer. An employee then told Reich that Mortenson would install the software at the remaining stations.
In December 1993, Mortenson utilized the Precision Bid Analysis software to prepare a bid for a project at Harborview Medical Center in Seattle. On the day of the bid, the software allegedly malfunctioned multiple times and gave the following message: "Abort: Cannot find alternate." Clerk's Papers at 60. Mortenson received this message 19 times that day. Nevertheless, Mortenson submitted a bid generated by the software. After Mortenson was awarded the Harborview Medical Center project, it learned its bid was approximately $1.95 million lower than intended.
Mortenson filed an action in King County Superior Court against Timberline and Softworks alleging breach of express and implied warranties. After the suit was filed, a Timberline internal memorandum surfaced, dated May 26, 1993. The memorandum stated, "[a] bug has been found [in the Precision software] ... that results in two rather obscure problems," and explained, "[t]hese problems only happen if the following [four] conditions are met." Clerk's Papers at 224. The memorandum concluded, "[g]iven the unusual criteria for this problem, it does not appear to be a major problem." Clerk's Papers at 224. Apparently, other Timberline customers had encountered the same problem and a newer version of the software was sent to some of these customers. After an extensive investigation, Timberline's lead programmer for Precision Bid Analysis acknowledged if the four steps identified in the memo were "reproduced as accurately as possible," Mortenson's error message could be replicated. Clerk's Papers at 248.
Timberline moved for summary judgment of dismissal in July 1997, arguing the limitation on consequential damages in the licensing agreement barred Mortenson's recovery. Mortenson countered that its entire *310 contract with Timberline consisted of the purchase order and it never saw or agreed to the provisions in the licensing agreement. The trial court granted Timberline's motion for summary judgment. The trial judge stated, "if this case had arisen in 1985 rather than 1997, I might have a different ruling "but "the facts in this case are such that even construing them against the moving party, the Court finds as a matter of law that the licensing agreements and limitations pertaining thereto were conspicuous and controlling and, accordingly, the remedies that are available to the plaintiff in this case are the remedies that were set forth in the licensing agreement...." Report of Proceedings (Aug. 15, 1997) at 49.
Mortenson appealed the summary judgment order to the Court of Appeals.[5] The Court of Appeals affirmed the trial court and held (1) the purchase order was not an integrated contract; (2) the license terms were part of the contract; and (3) the limitation of remedies clause was not unconscionable and, therefore, enforceable. M.A. Mortenson Co. v. Timberline Software Corp., 93 Wash.App. 819, 826-37, 970 P.2d 803 (1999). Mortenson petitioned this court for review, which we granted.

ANALYSIS
In reviewing an order of summary judgment, this court engages in the same inquiry as the trial court; summary judgment will be affirmed where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Hertog v. City of Seattle, 138 Wash.2d 265, 275, 979 P.2d 400 (1999) (citing Taggart v. State, 118 Wash.2d 195, 199, 822 P.2d 243 (1992); CR 56(c)). The facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party. Hertog, 138 Wash.2d at 275, 979 P.2d 400 (citing Taggart, 118 Wash.2d at 199, 822 P.2d 243). Questions of law are reviewed de novo. Hertog, 138 Wash.2d at 275, 979 P.2d 400 (citing Sherman v. State, 128 Wash.2d 164, 183, 905 P.2d 355 (1995)).

Applicable Law
Article 2 of the Uniform Commercial Code (U.C.C.), chapter 62A RCW, applies to transactions in goods. RCW 62A.2-102. The parties agree in their briefing that Article 2 applies to the licensing of software, and we accept this proposition. See, e.g., Aubrey's R.V. Ctr., Inc. v. Tandy Corp., 46 Wash.App. 595, 600, 731 P.2d 1124 (1987) (accepting agreement of parties that U.C.C. Article 2 applied to transaction involving defective software); Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 675-76 (3d Cir.1991) (holding that computer software falls within definition of a "good" under U.C.C. Article 2).[6]

Integration of the Contract
Mortenson contends because the purchase order fulfilled the basic requirements of contracting under the U.C.C., it constituted a fully integrated contract. As a result, Mortenson argues the terms of the license, including the limitation of remedies clause, were not part of the contract and, thus, are not enforceable. Timberline counters that the parties did not intend the purchase order to be an exclusive recitation of the contract terms, and points to the absence from the purchase order of several key details of the agreement. Timberline argues, and the trial court and Court of Appeals agreed, that the purchase order did not prevent the terms of *311 the license from becoming part of the contract or render the limitation of remedies clause unenforceable.
Whether the parties intend a written document to be a final expression of the terms of the agreement is a question of fact. Emrich v. Connell, 105 Wash.2d 551, 556, 716 P.2d 863 (1986). In determining whether an agreement is integrated, "the court may consider evidence of negotiations and circumstances surrounding the formation of the contract." Denny's Restaurants, Inc. v. Security Union Title Ins. Co., 71 Wash.App. 194, 202, 859 P.2d 619 (1993) (citing Restatement (Second) of Contracts § 216 (1981)). "[I]f reasonable minds can reach but one conclusion" on an issue of fact, it may be determined on summary judgment. Allen v. State, 118 Wash.2d 753, 760, 826 P.2d 200 (1992).
RCW 62A.2-204(1) provides, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Whether the purchase order qualifies as a contract at all does not resolve the issue of whether it is an integrated contract. Even if we assume the purchase order could, standing alone, constitute a complete contract under the U.C.C., such was not the case here. The language of the purchase order makes this clear.
For example, the purchase order sets an hourly rate for Timberline's provision of "software support," but does not specify how many hours of support Timberline would provide. The purchase order also states: "[a]t some future date should Timberline upgrade `Bid Day' to a windows version, M.A. Mortenson would be able to upgrade to this system with Timberline crediting existing software purchase toward that upgrade on a pro-rated basis to be determined later." Clerk's Papers at 206 (emphasis added). Finally, the purchase order does not contain an integration clause. The presence of an integration clause "strongly supports a conclusion that the parties' agreement was fully integrated...." Olsen Media v. Energy Sciences, Inc., 32 Wash.App. 579, 584, 648 P.2d 493 (1982). Here, the absence of such a clause further supports the conclusion that the purchase order was not the complete agreement between the parties. The trial court and the Court of Appeals correctly determined the purchase order did not constitute an integrated contract.

Terms of the Contract
Mortenson next argues even if the purchase order was not an integrated contract, Timberline's delivery of the license terms merely constituted a request to add additional or different terms, which were never agreed upon by the parties. Mortenson claims under RCW 62A.2-207[7] the additional terms did not become part of the contract because they were material alterations. Timberline responds that the terms of the license were not a request to add additional terms, but part of the contract between the parties. Timberline further argues that so-called "shrinkwrap" software licenses have been found enforceable by other courts, and that both trade usage and course of dealing support enforcement in the present case.
For its section 2-207 analysis, Mortenson relies on Step-Saver Data Sys., Inc. v. Wyse Tech., 939 F.2d 91 (3d Cir.1991). *312 There, Step-Saver, a value added retailer,[8] placed telephone orders for software and confirmed with purchase orders. The manufacturer then forwarded an invoice back to Step-Saver. The software later arrived with a license agreement printed on the packaging. Step-Saver, 939 F.2d at 95-96. Finding the license "should have been treated as a written confirmation containing additional terms," the Third Circuit applied U.C.C. section 2-207 and held the warranty disclaimer and limitation of remedies terms were not part of the parties' agreement because they were material alterations. Step-Saver, 939 F.2d at 105-06. Mortenson claims Step-Saver is controlling, as "virtually every element of the transaction in the present case is mirrored in Step-Saver." Br. of Appellant at 26. We disagree.
First, Step-Saver did not involve the enforceability of a standard license agreement against an end user of the software, but instead involved its applicability to a value added retailer who simply included the software in an integrated system sold to the end user. In fact, in Step-Saver the party contesting applicability of the licensing agreement had been assured the license did not apply to it at all. Step-Saver, 939 F.2d at 102. Such is not the case here, as Mortenson was the end user of the Bid Analysis software and was never told the license agreement did not apply.
Further, in Step-Saver the seller of the program twice asked the buyer to sign an agreement comparable to their disputed license agreement. Both times the buyer refused, but the seller continued to make the software available. Step-Saver, 939 F.2d at 102-03. In contrast, Mortenson and Timberline had utilized a license agreement throughout Mortenson's use of the Medallion and Precision Bid Analysis software. Given these distinctions, we find Step-Saver to be inapplicable to the present case.[9] We conclude this is a case about contract formation, not contract alteration. As such, RCW 62A.2-204, and not RCW 62A.2-207, provides the proper framework for our analysis.
RCW 62A.2-204 states:
(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.
(Emphasis added.)
Although no Washington case specifically addresses the type of contract formation at issue in this case, a series of recent cases from other jurisdictions have analyzed shrinkwrap licenses under analogous statutes. See Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 250-51, 676 N.Y.S.2d 569 (1998); Hill v. Gateway 2000, Inc., 105 F.3d 1147 (7th Cir.), cert. denied, 522 U.S. 808, 118 S.Ct. 47, 139 L.Ed.2d 13 (1997); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir.1996).
In ProCD, which involved a retail purchase of software, the Seventh Circuit held software shrinkwrap license agreements are a valid form of contracting under Wisconsin's version of U.C.C. section 2-204, and such agreements are enforceable unless objectionable under general contract law such as the law of unconscionability. ProCD, 86 F.3d at 1449-52. The court stated, "[n]otice on the outside, terms on the inside, and a right to return the software for a refund if the *313 terms are unacceptable (a right that the license expressly extends), may be a means of doing business valuable to buyers and sellers alike." ProCD, 86 F.3d at 1451.
In Hill, the customer ordered a computer over the telephone and received the computer in the mail, accompanied by a list of terms to govern if the customer did not return the product within 30 days. Hill, 105 F.3d at 1148. Relying in part on ProCD, the court held the terms of the "accept-or-return" agreement were effective, stating, "[c]ompetent adults are bound by such documents, read or unread." Hill, 105 F.3d at 1149 (emphasis added). Elaborating on its holding in ProCD, the court continued:
The question in ProCD was not whether terms were added to a contract after its formation, but how and when the contract was formedin particular, whether a vendor may propose that a contract of sale be formed, not in the store (or over the phone) with the payment of money or a general "send me the product," but after the customer has had a chance to inspect both the item and the terms. ProCD answers "yes," for merchants and consumers alike.

Hill, 105 F.3d at 1150 (emphasis added).
Interpreting the same licensing agreement at issue in Hill, the New York Supreme Court, Appellate Division concluded shrinkwrap license terms delivered following a mail order purchase were not proposed additions to the contract, but part of the original agreement between the parties. Brower, 246 A.D.2d at 250-51, 676 N.Y.S.2d 569. The court held U.C.C. section 2-207 did not apply because the contract was not formed until after the period to return the merchandise. Brower, 246 A.D.2d at 250, 676 N.Y.S.2d 569.[10]
We find the approach of the ProCD, Hill, and Brower courts persuasive and adopt it to guide our analysis under RCW 62A.2-204. We conclude because RCW 62A.2-204 allows a contract to be formed "in any manner sufficient to show agreement ... even though the moment of its making is undetermined," it allows the formation of "layered contracts" similar to those envisioned by ProCD, Hill, and Brower. See ProCD, 86 F.3d at 1452-53 (holding shrinkwrap license agreement was a valid form of contracting under U.C.C. section 2-204). We, therefore, hold under RCW 62A.2-204 the terms of the license were part of the contract between Mortenson and Timberline, and Mortenson's use of the software constituted its assent to the agreement, including the license terms.
The terms of Timberline's license were either set forth explicitly or referenced in numerous locations. The terms were included within the shrinkwrap packaging of each copy of Precision Bid Analysis; they were present in the manuals accompanying the software; they were included with the protection devices for the software, without which the software could not be used. The fact the software was licensed was also noted on the introductory screen each time the software was used. Even accepting Mortenson's contention it never saw the terms of the license, as we must do on summary judgment, it was not necessary for Mortenson to actually read the agreement in order to be bound by it. See Yakima County Fire Protection Dist. No. 12 v. City of Yakima, 122 Wash.2d 371, 389, 858 P.2d 245 (1993) (citing Skagit State Bank v. Rasmussen, 109 Wash.2d 377, 381-84, 745 P.2d 37 (1987)); Hill, 105 F.3d at 1148; Kaczmarek v. Microsoft Corp., 39 F.Supp.2d 974, 977 (N.D.Ill. 1999).[11]
*314 Furthermore, the U.C.C. defines an "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance...." RCW 62A.1-201(3) (emphasis added). Mortenson and Timberline had a course of dealing; Mortenson had purchased licensed software from Timberline for years prior to its upgrade to Precision Bid Analysis. All Timberline software, including the prior version of Bid Analysis used by Mortenson since at least 1990, is distributed under license. Moreover, extensive testimony and exhibits before the trial court demonstrate an unquestioned use of such license agreements throughout the software industry. Although Mortenson questioned the relevance of this evidence, there is no evidence in the record to contradict it. While trade usage is a question of fact, undisputed evidence of trade usage may be considered on summary judgment. Graaff v. Bakker Bros. of Idaho, Inc., 85 Wash.App. 814, 818, 934 P.2d 1228 (1997).
As the license was part of the contract between Mortenson and Timberline, its terms are enforceable unless "objectionable on grounds applicable to contracts in general...." ProCD, 86 F.3d at 1449.

Enforceability of Limitation of Remedies Clause
Mortenson contends even if the limitation of remedies clause is part of its contract with Timberline, the clause is unconscionable and, therefore, unenforceable.
Limitations on consequential damages are generally valid under the U.C.C. unless they are unconscionable. RCW 62A.2-719(3). Whether a limitation on consequential damages is unconscionable is a question of law. RCW 62A.2-302(1); American Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wash.2d 217, 222, 797 P.2d 477 (1990) (citing Schroeder v. Fageol Motors, Inc., 86 Wash.2d 256, 262, 544 P.2d 20 (1975)). "Exclusionary clauses in purely commercial transactions ... are prima facie conscionable and the burden of establishing unconscionability is on the party attacking it." American Nursery Prods., 115 Wash.2d at 222, 797 P.2d 477. If there is no threshold showing of unconscionability, the issue may be determined on summary judgment. Nelson v. McGoldrick, 127 Wash.2d 124, 132-33, 896 P.2d 1258 (1995).
Washington recognizes two types of unconscionability substantive and procedural which we will now address in turn.
1. Substantive Unconscionability.
Mortenson asserts Timberline's failure to inform it of the "defect" in the software prior to its purchase renders the licensing agreement substantively unconscionable.
"`Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh....'" Nelson, 127 Wash.2d at 131, 896 P.2d 1258 (quoting Schroeder, 86 Wash.2d at 260, 544 P.2d 20). "`Shocking to the conscience', `monstrously harsh', and `exceedingly calloused' are terms sometimes used to define substantive unconscionability." Nelson, 127 Wash.2d at 131, 896 P.2d 1258 (quoting Montgomery Ward & Co. v. Annuity Bd. of S. Baptist Convention, 16 Wash. App. 439, 444, 556 P.2d 552 (1976)).
As an initial matter, it is questionable whether clauses excluding consequential damages in a commercial contract can ever be substantively unconscionable. See American Nursery Prods., 115 Wash.2d at 237-38, 797 P.2d 477 (Utter, J., concurring) (citing Tacoma Boatbuilding Co. v. Delta Fishing Co., 28 U.C.C. Rep. Serv. 26, 35 (W.D.Wash.1980)). Even if the doctrine is applicable, however, the clause here is conscionable because substantive unconscionability does not address latent defects discovered after the contracting process. RCWA 62A.2-302(1) & cmt. 1; American Nursery Prods., 115 Wash.2d at 237, 797 P.2d 477 (Utter, J., concurring).
In Tacoma Boatbuilding, the Western District of Washington considered whether a contractual clause limiting consequential damages was substantively unconscionable under Washington law, where mechanical problems developed in several boat engines after the contracting process. Like Mortenson, *315 the purchaser in Tacoma Boatbuilding argued because the product did not work properly, the limitation clause was unconscionable. The court rejected this theory:
Comment 3 to [U.C.C.] § 2-719 generally approves consequential damage exclusions as "merely an allocation of unknown or undeterminable risks." Thus, the presence of latent defects in the goods cannot render these clauses unconscionable. The need for certainty in risk-allocation is especially compelling where, as here, the goods are experimental and their performance by nature less predictable.
Tacoma Boatbuilding, 28 U.C.C. Rep. Serv. at 35 (citation omitted).
We find the result in Tacoma Boatbuilding an accurate analysis of Washington's law of substantive unconscionability and adopt it here. In a purely commercial transaction, especially involving an innovative product such as software, the fact an unfortunate result occurs after the contracting process does not render an otherwise standard limitation of remedies clause substantively unconscionable.
An example of the proper focus of the substantive unconscionability doctrine is found in Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 254, 676 N.Y.S.2d 569 (1998). There, a shrinkwrap software license similar to the license in the present case included a mandatory arbitration clause, which required the use of a French arbitration company, payment of an advance fee of $4,000 (half which was nonrefundable), significant travel fees borne by the consumer, and payment of the loser's attorney fees. Brower, 246 A.D.2d at 249, 676 N.Y.S.2d 569. The Brower court found this clause substantively unconscionable. Brower, 246 A.D.2d at 254, 676 N.Y.S.2d 569.
In contrast, Timberline's consequential damages clause, when examined at the time the contract was formed, does not shock the conscience in the manner of the Brower mandatory arbitration clause; it is not substantively unconscionable.
2. Procedural Unconscionability.
Mortenson also contends the licensing agreement is procedurally unconscionable because "the license terms were never presented to Mortenson in a contractually-meaningful way." Supplemental Br. of Pet'r at 17.
Procedural unconscionability has been described as the lack of a meaningful choice, considering all the circumstances surrounding the transaction including "`[t]he manner in which the contract was entered,' whether each party had `a reasonable opportunity to understand the terms of the contract,' and whether `the important terms [were] hidden in a maze of fine print....'"
Nelson, 127 Wash.2d at 131, 896 P.2d 1258 (alterations in original) (quoting Schroeder, 86 Wash.2d at 260, 544 P.2d 20).
Examining the contracting process between the parties based on the above factors, we hold the clause to be procedurally conscionable. The clause was not hidden in a maze of fine print. Nelson, 127 Wash.2d at 131, 896 P.2d 1258. The license was set forth in capital letters on each diskette pouch and on the inside cover of the instruction manuals. A license to use the protection device was wrapped around each such device. The license was also referenced in the opening screen of the software program. This gave Mortenson more than ample opportunity to read and understand the terms of the license. Mortenson is also not an inexperienced retail consumer, but a nationwide construction contractor that has purchased licensed software from Timberline in the past. See Northwest Acceptance Corp. v. Hesco Constr., Inc., 26 Wash.App. 823, 830-31, 614 P.2d 1302 (1980) (finding liquidated damages clause conscionable in part because parties were commercially experienced).[12]
*316 Unconscionability "was never intended as a vortex for elements of fairness specifically embodied in other Code provisions." Tacoma Boatbuilding, 28 U.C.C. Rep. Serv. at 33. We find Mortenson's unconscionability claim unpersuasive and, therefore, find the limitation of remedies clause to be enforceable.

CONCLUSION
Mortenson has failed to set forth any material issues of fact on the issue of contract formation, and has also failed to make a threshold showing of unconscionability sufficient to avoid summary judgment.
We affirm the Court of Appeals, upholding the trial court's order of summary judgment of dismissal and denial of the motions to vacate and amend.
GUY, C.J., SMITH, MADSEN, TALMADGE, IRELAND, JJ., and BROWN, J.P.T., concur.
SANDERS, J. (dissenting).
Although the majority states "this is a case about contract formation, not contract alteration," Majority at 312, the majority abandons traditional contract principles governing offer and acceptance and relies on distinguishable cases with blind deference to software manufacturers' preferred method of conducting business. Instead of creating a new standard of contract formationthe majority's nebulous theory of "layered contracting"I would look to the accepted principles of the Uniform Commercial Code (U.C.C.) and the common law to determine whether Timberline's licensing agreement is enforceable against Mortenson. Because the parties entered a binding and enforceable contract prior to the delivery of the software, I would treat Timberline's license agreement as a proposal to modify the contract requiring either express assent or conduct manifesting assent to those terms. Because this is a review of a summary judgment and we must view all facts and inferences in the light most favorable to Mortenson, I would remand to the trial court to determine whether Mortenson manifested assent to the terms of Timberline's license agreement.

Offeror is Master of the Offer
It is well established that the offeror is the master of his offer under traditional contract law principles.
[E]ven under the liberal rules of contract formation as contained in the U.C.C., the Code drafters still recognized and gave approval to an ancient and cardinal rule of the law of contracts. The offeror is the master of his offer. An offeror may prescribe as many conditions, terms or the like as he may wish, including but not limited to, the time, place and method of acceptance.
Kroeze v. Chloride Group Ltd., 572 F.2d 1099, 1105 (5th Cir.1978) (citations omitted); see also RCW 62A.2-206(1)(a) ("Unless otherwise unambiguously indicated by the language or circumstances, an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."). Thus, under both the common law of contracts and the U.C.C., the offeror has the power to structure the terms of its offer as well as the mode of its acceptance.
In recognition of this basic tenet of contract law, every court that has considered the enforceability of a "shrinkwrap" license agreement[1] has begun its analysis with an examination of the method of offer and acceptance utilized by the parties. The first of such cases, Step-Saver Data Sys., Inc. v. *317 Wyse Tech., 939 F.2d 91 (3d Cir.1991), involved a claim by a value added retailer, Step-Saver, for breach of warranties against the software vendor, The Software Link (TSL). The court explained Step-Saver's purchase of the software as follows:
First, Step-Saver would telephone TSL and place an order. (Step-Saver would typically order twenty copies of the program at a time.) TSL would accept the order and promise, while on the telephone, to ship the goods promptly. After the telephone order, Step-Saver would send a purchase order, detailing the items to be purchased, their price, and shipping and payment terms. TSL would ship the order promptly, along with an invoice. The invoice would contain terms essentially identical with those on Step-Saver's purchase order: price, quantity, and shipping and payment terms. No reference was made during the telephone calls, or on either the purchase orders or the invoices with regard to a disclaimer of any warranties.
Printed on the package of each copy of the program, however, would be a copy of the box-top license.
Id. at 95-96. Although TSL argued that the contract between it and Step-Saver did not come into existence until Step-Saver received the program, saw the terms of the license, and opened the program packaging, the court rejected this argument. Finding that TSL's shipment of the order and Step-Saver's payment and acceptance demonstrated the existence of the contract, the court held the dispute involved the terms of the contract. Id. at 98. The court resorted to U.C.C. § 2-207(3) to resolve this question:
When the parties's conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as the terms of their agreement, and the writings exchanged by the parties do not agree, UCC § 2-207 determines the terms of the contract.
Step-Saver, 939 F.2d at 98. Viewing the shrinkwrap license agreement as "a written confirmation containing additional terms," the court held the license was not part of the agreement because it would materially alter the parties' agreement. Id. at 105-06.
Step-Saver demonstrates that time of contract formation is crucial. The court there implicitly held that the contract was formed when TSL accepted Step-Saver's telephone offer with its promise to ship the software. Accordingly, the contract included terms relating to price, shipment, and payment because those were the terms agreed to in both the invoice and purchase order. But because the warranty disclaimers were not delivered until "after the contract [was] formed," id. at 105, they were not binding.
Arizona Retail Sys., Inc. v. Software Link, Inc., 831 F.Supp. 759 (D. Arizona 1993), a case not even mentioned by the majority, clearly illustrates considerations of offer and acceptance can be determinative with regard to the enforceability of a shrinkwrap license agreement. Arizona Retail Systems involved multiple transactions between a software vendor, TSL, and a value-added retailer, Arizona Retail Systems (ARS). After noting "the first contract entered into by the parties involves facts and circumstances materially different than the subsequent contracts," id. at 763, the court described the initial contract formation as follows:
TSL made the offer by including the live copy of PC-MOS with the evaluation diskette. The live copy appears to have been sealed in an envelope, the outside of which stated that by opening the envelope the user acknowledges "acceptance of this product, and [consents] to all the provisions [of] the Limited Use License Agreement." ARS, therefore, accepted TSL's offer on TSL's terms when the envelope was opened.

Id. at 764 (alterations in original) (citation omitted) (emphasis added). Since TSL as the seller-offeror in the initial purchase set the terms of the offer, the court held that the offer contained the shrinkwrap license included by TSL. "[T]he contract was not formed when TSL shipped the goods but rather only after ARS opened the shrink wrap ... which ARS had notice would result in a contract being formed."[2]Id. at 763.
*318 With respect to the subsequent purchases, however, the court held the license agreement did not apply. The court first noted the circumstances surrounding the subsequent purchases were nearly identical to the circumstances in Step-Saveri.e., ARS telephoned TSL to order software; TSL accepted the offer by promising to ship; the software arrived with the license agreement affixed. Thus, the court held "[b]y agreeing to ship the goods to ARS, or, at the latest, by shipping the goods, TSL entered into a contract with ARS." Id. at 765. The court then explained why the license agreement was not enforceable:
After entering into the contract, TSL was not free to treat the license agreement as a conditional acceptance, which is essentially a counter-offer. The license agreement thus is best seen as a proposal to modify the contract between the parties, which... was not effective because ARS never specifically assented to the proposed terms.
Id. (footnotes and citations omitted). Because ARS was the offeror in these purchases, it was in control of the offer. The court injected a bit of commercial reality into its discussion with the following observation: "Requiring the seller to discuss terms it considers essential before the seller ships the goods is not unfair; the seller can protect itself by not shipping until it obtains assent to those terms it considers essential." Id. at 766.
Despite numerous similarities between the transaction at issue here and that in Step-Saver, the majority found Step-Saver to be "inapplicable" and refused to follow its logic. Majority at 312. The majority distinguished Step-Saver from the instant case on three grounds: (1) Step-Saver was a value added retailer, not an end user (the party to which a license agreement typically applies); (2) Step-Saver twice refused to sign an agreement comparable to the license agreement, but the seller continued to provide the software; and (3) the contract in Step-Saver was "between merchants." See Majority at 311-312. While I agree these are notable factual distinctions, the majority does not explain why these distinctions warrant the outright dismissal of Step-Saver's logic given the strong similarities between the contract formation there and in the instant case. Further, the majority does not even mention Arizona Retail Sys., 831 F.Supp. 759. Arizona Retail Systems, like Step-Saver, also involved the applicability of a license agreement to a value added retailer (as opposed to an end user) and was "between merchants." But these details were apparently insignificant, as they did not change the court's determination that the license agreement applied to the parties' first transaction. The court did not focus on the parties, but rather looked to how the contract was formed in each instance to determine the enforceability of the license agreement.
In addition to Step-Saver and Arizona Retail Systems, there are three other cases that have analyzed shrinkwrap license agreements and found them to be enforceable. See Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 676 N.Y.S.2d 569 (1998); Hill v. Gateway 2000, Inc., 105 F.3d 1147 (7th Cir.), cert. denied, 522 U.S. 808, 118 S.Ct. 47, 139 L.Ed.2d 13 (1997); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir.1996). Although the majority here found "the approach of the ProCD, Hill, and Brower courts persuasive" and adopted it as a means of enforcing the license agreement, Majority at 313, these cases are unquestionably distinguishable.
In ProCD, 86 F.3d 1447, the Seventh Circuit considered whether a consumer who purchased off-the-shelf software in a retail setting was bound by the shrinkwrap license agreement. The court first distinguished Step-Saver and Arizona Retail Systems on the grounds that "these are not consumer transactions." ProCD, 86 F.3d at 1452. The court further distinguished the decision in *319 Step-Saver as a battle-of-the-forms case which had no application because "[o]ur case has only one form." Id. The court then explained why the license agreement was binding:
A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance. And that is what happened. ProCD proposed a contract that a buyer would accept by using the software after having an opportunity to read the license at leisure.... [T]he UCC permits contracts to be formed in other ways. ProCD proposed such a different way, and without protest Zeidenberg agreed.
Id. Under the traditional rules of contract formation, ProCD controlled the terms of the transaction and thus could dictate the mode of acceptance. See Corbin on Contracts § 88, at 136 (1952) ("The offeror creates the power of acceptance; and he has full control over the character and extent of the power that he creates.").
In Hill, 105 F.3d 1147, the Seventh Circuit extended the applicability of the ProCD decision from software to the computer itself. The court summarized the issue presented as follows:
A customer picks up the phone, orders a computer, and gives a credit card number. Presently a box arrives, containing the computer and a list of terms, said to govern unless the customer returns the computer within 30 days. Are these terms effective as the parties' contract, or is the contract term-free because the order-taker did not read any terms over the phone and elicit the customer's assent?
Hill, 105 F.3d at 1148. After noting with approval the "vendor as master of the offer" language contained in ProCD, the court stated:

The question in ProCD was not whether terms were added to a contract after its formation, but how and when the contract was formed in particular, whether a vendor may propose that a contract of sale be formed, not in the store (or over the phone) with the payment of money or a general "send me the product," but after the customer has had a chance to inspect both the item and the terms. ProCD answers "yes," for merchants and consumers alike.
Hill, 105 F.3d at 1150 (emphasis added).[3] Gatewaylike the vendor in ProCDwas the offeror and controlled the terms of the transaction. Because Gateway specified that acceptance of its offer would occur only after the buyer retained the computer for more than 30 days, the court enforced the terms and conditions that accompanied the computer.
In Brower the court upheld the same licensing agreement at issue in Hill against a challenge brought by a class of retail consumers. Focusing on the formation of the contract, the court explained:
[T]here is no agreement or contract upon the placement of the order or even upon the receipt of the goods. By the terms of the Agreement at issue, it is only after the consumer has affirmatively retained the merchandise for more than 30 dayswithin which the consumer has presumably examined and even used the product(s) and read the agreementthat the contract has been effectuated.
Brower, 246 A.D.2d at 251, 676 N.Y.S.2d 569. As the offeror, Gateway controlled the manner in which its offer was accepted. Because the consumers accepted Gateway's offer by retaining the computer for more than 30 days, the court held the disputed terms to be "simply one provision of the sole contract `proposed' between the parties." Id.
As all these cases make clear, the determinative inquiry in the instant case is which partyas offerordictated the mode of acceptance and the terms of the transaction? The record here is clearMortenson issued a purchase order which identified the parties, *320 product, quantity, price, and a variety of other terms. Clerk's Papers (CP) at 206. Timberline's representative, Reich, accepted Mortenson's offer by signing the purchase order and promising to order the software. As the offeror, Mortenson controlled the terms of the transaction, to which Timberline unequivocally agreed when it accepted Mortenson's offer. Accordingly, the parties created a binding and enforceable contract before Mortenson received the software and purportedly discovered Timberline's license agreement.
As Timberline entered an enforceable agreement by agreeing to the terms of Mortenson's offer, Timberline's subsequent delivery of the license agreement constitutes a proposal to modify the contract pursuant to RCW 62A.2-209.[4] In Arizona Retail Systems, the court held:
Section 2-209 requires assent to proposed modifications and this court, like the court in Step-Saver, concludes that the assent must be express and cannot be inferred merely from a party's conduct in continuing with the agreement. ARS, like Step-Saver, did not expressly assent to the modification and the Step-Saver court made clear that merely continuing with a contract does not constitute assent.
Arizona Retail Sys., 831 F.Supp. at 764; see also Restatement (Second) of Contracts § 19(1) (1981) (a party may manifest assent by written or spoken words, by other acts, or by failure to act). Mortenson asserts that Timberline's representative opened the boxes containing the software, opened the software packaging, and installed the program onto Mortenson's computers. As a result, Mortenson claims it never saw the licensing agreement purportedly attached to the software. Further, although the majority claims the parties had a course of dealing based on Mortenson's prior purchases from Timberline, majority at 314, it is not clear Mortenson ever previously consented to the terms contained in Timberline's license agreement. See Step-Saver, 939 F.2d at 104 ("[T]he repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing....").
The majority acknowledges we must accept "Mortenson's contention it never saw the terms of the license, as we must do on summary judgment...." Majority at 313. But because Mortenson did not expressly assent to the terms of Timberline's license agreement after a binding contract was made, I would reverse the trial court's summary judgement order and remand for a determination of whether Mortenson's conduct constituted assent. If Mortenson did not assent to Timberline's license agreement, the trial court should allow Mortenson to proceed to a trial on the merits.

Conclusion
Although the majority recognizes the purchase order is a "contract," Majority at 310-311, the majority ultimately disregards this binding and enforceable agreement and allows Timberline to unilaterally inject its own termswithout finding Mortenson even saw these termsafter the conclusion of the contract formation process. If Timberline's license was essential to its assent to the contract, Timberline should have countered Mortenson's offer and included the terms of its license agreement. "Requiring the *321 seller to discuss terms it considers essential before the seller ships the goods is not unfair; the seller can protect itself by not shipping until it obtains assent to those terms it considers essential." Arizona Retail Sys., 831 F.Supp. at 766. What is unfair here, however, is the majority's rewriting of Mortenson's contract with Timberline.
I dissent.
ALEXANDER, J., concurs.
NOTES
[1] Bid Analysis is designed for use by general contractors preparing construction bids. The program analyzes project requirements as well as bid information from subcontractors and finds the lowest cost combination of subcontractors to carry out the required work.
[2] Mortenson subsequently ordered a ninth copy of the software.
[3] Items appearing in upper case in the original documents appear in upper case in this opinion.
[4] A protection device is a piece of hardware that must be affixed to a computer in order to operate the Bid Analysis software; the program will not operate without the device. Mortenson received one protection device for each copy of software it ordered.
[5] Four months after filing its notice of appeal, Mortenson moved to vacate the trial court judgment and amend its pleadings to include tort claims. The trial court denied these motions and the Court of Appeals affirmed. M.A. Mortenson Co., 93 Wash.App. at 837-39, 970 P.2d 803. While Mortenson argues in its supplemental briefing that the Court of Appeals erred in affirming the trial court's denial of these motions, it fails to include this issue in its petition for review. As such, we decline to reach it. RAP 13.7(b).
[6] In 1999 the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Computer Information Transactions Act (UCITA) to cover agreements to "create, modify, transfer, or license computer information or informational rights in computer information." UCITA § 102(a)(12), ___ U.L.A. ___ (2000); see also UCITA § 103, ___ U.L.A. ___ (2000). The UCITA, formerly known as proposed U.C.C. Article 2B, was approved and recommended for enactment by the states in July 1999.
[7] RCW 62A.2-207 states:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
"(a) the offer expressly limits acceptance to the terms of the offer;
"(b) they materially alter it; or
"(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Title."
[8] A "value added retailer" evaluates the needs of a particular group of potential computer users, compares those needs with the available technology, and develops a package of hardware and software to satisfy those needs. Step-Saver, 939 F.2d at 93.
[9] We also note the contract here, unlike the contract in Step-Saver, was not "between merchants" because Mortenson does not deal in software. See RCW 62A.2-104 (merchant is person who deals in or has particular skill with respect to the kind of goods involved in the transaction). RCW 62A.2-207 does not specify when additional terms become part of a contract involving a nonmerchant.
[10] The fact the approach utilized by the ProCD, Hill, and Brower courts represents the overwhelming majority view on this issue is further demonstrated by its adoption into the UCITA. See UCITA § 208 cmt. 3 (Approved Official Draft), ___ U.L.A. ___ (2000) (noting intent to adopt the rule in these cases). The UCITA embraces the theory of "layered contracting," which acknowledges while "some contracts are formed and their terms fully defined at a single point in time, many transactions involve a rolling or layered process. An agreement exists, but terms are clarified or created over time." UCITA § 208 cmt. 3 (Approved Official Draft).
[11] We note even if Mortenson's Bellevue employees never saw a copy of the license terms, Mortenson does not dispute that additional copies of the software were forwarded to its other offices. Even had Reich completed the entire installation process at the Bellevue office, he did not install the software at Mortenson's other offices.
[12] Furthermore, we note a party defending a limitation on consequential damages "may prove the clause is conscionable regardless of the surrounding circumstances if the general commercial setting indicates a prior course of dealing or reasonable usage of trade as to the exclusionary clause." American Nursery Prods., 115 Wash.2d at 223, 797 P.2d 477 (emphasis added); see also Cox v. Lewiston Grain Growers, Inc., 86 Wash. App. 357, 369, 936 P.2d 1191, review denied, 133 Wash.2d 1020, 948 P.2d 387 (1997). The same uncontradicted evidence of trade usage and course of dealing noted in our analysis of contract formation supports the conclusion that the clause is procedurally conscionable.
[1] Vendors of computer software use plastic shrink-wrapping as a mechanism of attaching terms under which they purport to make their product available.

In the mass market/consumer context, the shrink-wrap license provides an efficient way for the software vendor to dictate the terms of each sale. When a business purchases a specialized software program, it typically negotiates, with the vendor, its rights of use in the software. In the mass market setting, however, the negotiation of terms for each sale is clearly impractical.
Robert J. Morrill, Contract Formation and the Shrink Wrap License: A Case Comment on ProCD, Inc. v. Zeidenberg, 32 New Eng. L.Rev. 513, 516 (1998) (footnotes omitted).
[2] The court was careful to note this decision was consistent with Step-Saver Data Sys., Inc. v. Wyse Tech., 939 F.2d 91 (3d Cir.1991).

The Step-Saver court addressed the situation in which a contract had been formed by the conduct of the partiesi.e., through the ordering and shipping of the agreed-upon goodsbut the goods arrived with the license agreement affixed. In such cases, the contract is formed before the purchaser becomes aware of the seller's insistence on certain terms.
Arizona Retail Sys., Inc. v. The Software Link, Inc., 831 F.Supp. 759, 763 (D. Arizona 1993) (emphasis added).
[3] It should be noted that the court in Hill misconstrued ProCD's holding by stating that "ProCD answers `yes,' for merchants and consumers alike." Hill, 105 F.3d at 1150. As noted above, ProCD distinguished both Step-Saver and Arizona Retail Systems primarily because they involved, merchants and were not consumer transactions.
[4] RCW 62A.2-209 provides:

(1) An agreement modifying a contract within this Article needs no consideration to be binding.
(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.
(3) The requirements of the statute of frauds section of this Article (RCW 62A.2-201) must be satisfied if the contract as modified is within its provisions.
(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.
(5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.