# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| G.M., an individual, | No. 57814-0-II |
| Plaintiff below, | |
| J.S., an individual, | |
| Appellant, | |
| v. | |
| OLYMPIA KIWANIS BOYS RANCH, a/k/a O.K. BOYS RANCH, a non-profit entity; KIWANIS INTERNATIONAL, a non-profit entity; KIWANIS PACIFIC NORTHWEST DISTRICT, a non-profit entity; KIWANIS, a non-profit entity; KIWANIS CLUB OF OLYMPIA, a non-profit entity; | ORDER GRANTING MOTION TO PUBLISH |
| Respondents, | |
| MARK S. REDAL, an individual; KRISTY GALT, an individual; STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, CHILD PROTECTIVE SERVICES, and DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES, government entities; COMMUNITY YOUTH SERVICES, a non-profit entity; OUR HOUSE, a non-profit entity, | |
| Defendants below. | |

Appellant, JS, filed a motion to publish the Court's unpublished opinion filed in this matter on April 9, 2024. After consideration, the court grants the motion. It is now

**ORDERED** that the opinion will be published.

No. 57814-0-II

**PANEL:** Jj. Cruser, Veljacic, Che

**FOR THE COURT:**

_____
CRUSER, C.J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| G.M., an individual, | No. 57814-0-II |
| Plaintiff below, | |
| J.S., an individual, | |
| Appellant, | |
| v. | |
| OLYMPIA KIWANIS BOYS RANCH, a/k/a O.K. BOYS RANCH, a non-profit entity; KIWANIS INTERNATIONAL, a non-profit entity; KIWANIS PACIFIC NORTHWEST DISTRICT, a non-profit entity; KIWANIS, a non-profit entity; KIWANIS CLUB OF OLYMPIA, a non-profit entity; | UNPUBLISHED OPINION |
| Respondents, | |
| MARK S. REDAL, an individual; KRISTY GALT, an individual; STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, CHILD PROTECTIVE SERVICES, and DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES, government entities; COMMUNITY YOUTH SERVICES, a non-profit entity; OUR HOUSE, a non-profit entity, | |
| Defendants below. | |

Cruser, C.J. — JS was a foster youth for many years and recalls being abused at three placements, including at the Olympia Kiwanis' Boys Ranch (OKBR). He sued Kiwanis[1] for the abuse that he alleges occurred there. JS maintained throughout discovery that he resided at OKBR at some time during his youth but could not remember exact dates. Kiwanis moved for summary judgment, arguing that JS failed to show that it owed him any duty of care because he never resided at OKBR. The trial court granted summary judgment and dismissed JS's claims with prejudice.

JS now appeals, arguing that his testimony creates a genuine issue of material fact as to whether he resided at OKBR. Kiwanis argues that JS's testimony does not defeat summary judgment because it is contradicted by documentary evidence and because he testified inconsistently regarding the time period he recalls residing at OKBR. We reverse the trial court.

FACTS

I. BACKGROUND

JS was born in 1974 and entered foster care shortly thereafter. During his childhood, he resided at several placements including foster homes, group homes, and crisis resource centers. He recalls being sexually abused in at least three of those placements: Luther Child Center, Secret Harbor, and OKBR. He does not, however, remember exact dates of these childhood events.

II. LITIGATION

JS sued Kiwanis for gross negligence due to the abuse he recalls being subjected to at OKBR. He also sued the State and individual State defendants.[2] At the time JS filed his complaint,

---

[1] JS sued OKBR, Kiwanis Club of Olympia, and Kiwanis International. For the sake of simplicity, we refer to the Kiwanis defendants jointly as Kiwanis.

[2] The State was dismissed from this appeal upon JS's and the State's joint motion.

he could not recall the dates he resided at OKBR but alleged that he believed he was 8 years old and was placed there between 1982 and 1984.

Discovery followed. JS maintained in his answers to interrogatories that he did not recall the dates he resided at OKBR, but that he believed it was between 1989 and 1993. The State asserted in its answers that JS was never placed at OKBR. JS was deposed in October 2022 and testified at length about the details of the abuse he remembers happening at OKBR. However, he still could not recall the specific dates he resided there.

A. MOTION FOR SUMMARY JUDGMENT

Kiwanis moved for summary judgment. It argued that there was no genuine issue of material fact as to whether JS was placed at OKBR and that it was therefore entitled to dismissal as a matter of law because it owed him no duty. It argued it was entitled to dismissal "because there is no admissible evidence that he was ever at OKBR—other than his unsupported testimony." Clerk's Papers (CP) at 99. It drew the court's attention to discrepancies in JS's prior statements about when he believed he resided at OKBR.

JS argued in response that his testimony created a genuine issue of material fact precluding summary judgment. He emphasized that he had specific memories of being at OKBR notwithstanding that he could not remember exact dates. Both JS and Kiwanis submitted evidence including deposition transcripts, written discovery, and contemporaneous written records.

*(1) JS's Deposition Testimony*

Kiwanis submitted excerpts from JS's depositions taken in his separate lawsuit against Secret Harbor in February and April 2021. In those excerpts, JS testified he could not recall whether he resided at OKBR before or after residing at Secret Harbor. He described how he

remembered OKBR: he believed it was a two-story house on a hill and recalled that it was repainted at some time while he resided there. He also shared descriptive memories of the fighting at OKBR and recalled staff rewarding children for fighting with cigarettes and extra food.

Kiwanis and JS also submitted deposition excerpts from JS's deposition in this matter taken in October 2022. In that deposition, JS explained, "I cannot give you specific dates, but I do have specific memories of being at OK Boys Ranch." *Id.* at 193. He also testified, "I know that I've been there . . . But as far as specific times, dates and ages and things like that, my mind doesn't remember things like that. What my mind remembers is the terrifying things that happened and the abuse that happened." *Id.* at 148-49. He went on to testify, "I'm almost 50 years old, and I can't give you exact times and dates" but recalled, "I was only there maybe a couple of weeks, and then I ran away." *Id.* at 192, 206. He also described in detail the sexual abuse he remembers occurring at OKBR.

*(2) Documentary Evidence*

The parties submitted three letters from OKBR personnel to State personnel regarding OKBR's plans to accept JS as a resident. The first two letters were signed by Tom Van Woerden, the Director of OKBR. Van Woerden wrote that "we will be accepting [JS] into our agency for residential care at our next available opening in approximately two weeks." *Id.* at 230. Separately, he wrote that OKBR "will be accepting an 11 year old boy into care shortly" and identified JS by his birth date. *Id.* at 228. The third letter was from an OKBR caseworker to JS's State caseworker regarding "our request for funding of a 40-hour/week staff member for [JS]." *Id.* at 232. All three letters were written in August 1986.

The parties also submitted JS's discharge summary from a hospital indicating he was admitted on October 13, 1986, and discharged on December 1, 1986. This record states that JS was admitted to investigate "whether there is an underlying psychotic process." *Id.* at 234. It notes that JS "was to have been placed at [OKBR], but placement has been suspended due to question of psychosis." *Id.* at 235. It also provides, "If he is felt not to be psychotic, the [OKBR] has indicated they would consider him a candidate for placement." *Id.* at 234. Finally, it indicates that JS "[a]t no time" showed behavior suggesting "underlying psychotic process" during this evaluation. *Id.* at 237.

The discharge summary also describes a plan for JS's living situation: first, he was to be released to his State case manager, Bud O'Hair. Because no residential treatment placement was immediately available, he would stay temporarily at a crisis residential center and receive outpatient psychotherapy. The discharge plan indicates that a foster home could be considered "while awaiting residential placement." *Id.* at 238.

Finally, Kiwanis submitted JS's State placement record purporting to show his residences from June 1981 to November 1988. This handwritten document indicates that JS resided in crisis resource centers from July 23 to October 13, 1986. It shows that from October 13 to November 24, 1986, he was in the hospital. Then, from November 25 to 31, 1986, he was at a crisis resource center, and from December 1 to 18, he was in a foster home. After that, the record contains a gap from December 19 to 29, 1986.[3]

---

[3] The document also provides that he was at "CRC [and] on the run" from June 17, 1986 through July 12, 1987. CP at 161. However, the year 1986 appears to be a scrivener's error because immediately preceding this gap, he was placed at Deschutes Center from December 30, 1986 to June 16, 1987. Accounting for the scrivener's error, this creates another gap in placement from June 17 to July 12, 1987.

*(3) Oral Argument*

At oral argument, Kiwanis argued that its motion should be granted because "the only evidence that he was there is his own self-serving testimony that . . . is not corroborated by any documentation or any other people who would testify." Verbatim Rep. of Proc. at 7. It reiterated that JS's inability to stick to a consistent timeline made it unbelievable that he resided at OKBR at any time. It argued that to the extent JS remembered anything about the facility, those memories were incorrect, and that "it is certainly possible that he's thinking of a different facility." *Id.*

Furthermore, Kiwanis argued that there was "affirmative evidence" showing that JS was "never there." *Id.* It pointed to the hospital record, which according to Kiwanis showed that JS was never sent to OKBR because his placement there was "suspended due to psychosis." *Id.* at 10. Finally, it argued that JS's claims were a "waste of judicial resources and people's time and money." *Id.* at 13. The State, joining in the motion, argued that JS's sworn testimony was speculative and there was insufficient evidence to create a genuine issue of material fact.

JS argued that granting the motion would require the trial court to "improperly weigh the evidence and make a credibility determination" by discounting JS's testimony due to inconsistencies with his placement records. *Id.* at 15. He also pointed out that the placement history document was inaccurate in other ways so should not be taken as absolute truth.

*(4) Outcome*

The trial court granted summary judgment and dismissed the case. It considered the motion, response, and reply, as well as the declarations and exhibits attached.

JS now appeals.

8

## DISCUSSION

### I. SUMMARY JUDGMENT

JS argues that summary judgment was improper because it was his right to have a jury determine disputed factual issues and because his sole burden on summary judgment was to submit admissible evidence that created a disputed question of material fact. We agree.

### A. LEGAL PRINCIPLES

We review summary judgment orders de novo. *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 722, 425 P.3d 837 (2018). We consider only the evidence and issues called to the trial court's attention. RAP 9.12.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). If reasonable minds can disagree on the facts controlling the outcome of the case, a genuine issue of material fact exists and summary judgment is inappropriate. *Reagan v. Newton*, 7 Wn. App. 2d 781, 789, 436 P.3d 411 (2019).

We view the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in the nonmoving party's favor. *Martin*, 191 Wn.2d at 722. We take a nonmoving plaintiff's testimony as true, even if that testimony is self-serving. *Reagan*, 7 Wn. App. 2d at 806. Issues of fact may not be resolved on summary judgment unless, based on the evidence presented, reasonable minds can reach only one conclusion. *M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 140 Wn.2d 568, 579, 998 P.2d 305 (2000).

B. APPLICATION

We conclude that the evidence presented by JS is sufficient to defeat summary judgment because reasonable minds could conclude that he resided at OKBR based on his testimony and the written records provided to the court. Whether JS resided at OKBR is a material fact relevant to the legal question of whether OKBR owed him a duty of care, and summary judgment is inappropriate in light of the conflicting evidence about this fact.

JS testified consistently in all his depositions that he remembers residing at OKBR. His testimony includes detailed descriptions of not only the events he remembers occurring at OKBR, but also its location and setting. Kiwanis argues that JS's testimony is insufficient to preclude summary judgment because it was speculative, conclusory, and contained argumentative assertions. But JS spoke directly about his time at OKBR; he did not argue legal conclusions or speculate about topics outside of his personal experience. And "we must treat the plaintiff's eyewitness testimony as true, even if it is self-serving." *Reagan*, 7 Wn. App. at 806. Because JS testified that he resided at OKBR, we must take that as true.

To the extent JS could not recall the dates of his residence at OKBR, any inconsistency goes to his credibility, a question not considered at summary judgment. Importantly, the question of *when* JS resided at OKBR is distinct from the question of *whether* he resided there at all. JS's testimony about *when* he resided at OKBR includes inconsistencies, to be sure. But those inconsistencies are immaterial to the question of *whether* he resided there *at some time* in his youth. The legal question of whether Kiwanis owed a duty of care to JS does not turn on exactly when he was a resident, and the fact that he cannot recall exact dates does not make his testimony speculative.

Moreover, the documentary evidence does not contradict JS's testimony; indeed, it raises the reasonable inference that he *did* in fact reside at OKBR. Contemporaneous letters show that JS was accepted for placement at OKBR in August 1986. A few months later, his placement there was suspended while he was evaluated for psychosis. Kiwanis makes much of this suspension, but nothing in the record indicates the suspension was ever made permanent. The same record indicates OKBR still considered him a good candidate for placement if, after evaluation, he was found "not to be psychotic." CP at 178. He underwent evaluation and he "[a]t no time" showed behavior suggesting "underlying psychotic process." *Id.* at 237. Taken in the light most favorable to JS, we can infer that OKBR was willing to accept JS as a resident after his release from the hospital in December 1986, and that he moved into OKBR shortly thereafter.[4]

Finally, with respect to Kiwanis' policy arguments, it is not our role to weigh the judicial resources that will be spent hearing a case against its merits. We are bound by longstanding summary judgment jurisprudence not to decide factual issues at this stage unless reasonable minds can reach but one conclusion. *See Mortenson*, 140 Wn.2d at 579. Taking JS's facts as true, he has provided sufficient evidence to preclude summary judgment. We reverse.

ATTORNEY FEES

Kiwanis asserts that we should award fees on appeal under RAP 18.9 because JS's appeal is frivolous. We disagree and decline to award fees because JS has prevailed in this appeal.

---

[4] Kiwanis' evidence does not contradict this inference because shortly after JS was discharged, his placement record contains a gap from December 19 to 29, 1986.

11

No. 57814-0-II

CONCLUSION

We reverse the summary judgment order dismissing JS's claims and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

VELJACIC, J.

CHE, J.

12